(No. 32220.—

ADOLPH STALDER *et al.*, Appellants, *vs.* JAMES ROBERT STONE *et al.*, Appellees.

*Opinion filed May 22, 1952—Rehearing denied September 15, 1952.*

CRAMPTON, J., dissenting.
BRISTOW, J., took no part.

BURRELL & BURRELL, and JOHN G. WHITON, both of Freeport, (DAVID M. BURRELL, of counsel,) for appellants.

· HAROLD T. BERC, and BRANKO M. STEINER, both of Chicago, for appellee Adale Stauske.

Mr. JUSTICE MAXWELL delivered the opinion of the court:

The county court of Stephenson County allowed a petition for the adoption of James Robert Stone, filed by Adolph Stalder and Viva Stalder, hereinafter referred to as plaintiffs, which had been contested by the alleged natural mother, Adale Stauske, herein referred to as defendant. The Appellate Court of Illinois, Second District, reversed the adoption order on the theory that there was insufficient evidence to establish the statutory grounds for adoption, and this court has allowed plaintiff's petition for leave to appeal.

Plaintiffs' first petition for adoption of James Robert Stone alleged that he was born on September 29, 1943, as the son of one Jane Stone; that the child had been placed in their home by Adale Stauske on August 1, 1945, and had resided with them since; that the parents had abandoned the child, and had deserted the child for a period of more than six months next preceding the filing of the petition; and alleged on information and belief that the father of the child was dead. Adale Stauske answered this petition alleging that she was the natural mother of the child and denying abandonment and desertion. After a hearing, the court found that Adale Stauske was the natural mother of the child and found her not guilty of abandonment or desertion and denied adoption. Within thirty days thereafter plaintiffs filed their motion to vacate this order, supported by affidavit, alleging that defendant was a depraved person and that she had been, and currently was, guilty of open and notorious adultery and fornication. Defendant's motion to dismiss plaintiffs' motion to vacate was denied, the motion to vacate was allowed and a second hearing had, resulting in the judgment appealed to the Appellate Court.

Although defendant has interposed issues respecting the pleadings and the admission of evidence, the essential inquiry presented by this appeal is whether the evidence establishes that the natural parent abandoned or deserted the child or was unfit by reason of depravity within the terms of the Adoption Act. Ill. Rev. Stat. 1947, chap. 4, par. 4-1.

The background facts which are patently connected with the conduct of defendant, Adale Stauske, disclose that her own mother died when defendant was an infant, and that she and her twin sister were reared by an aunt and uncle who adopted them. The girls later ran away from home, and defendant became a registered nurse, while her sister eventually married and reared a family.

In 1932, while working in the West Side Hospital of Chicago, Adale Stauske attended Lawrence Rhode, who had sustained a fractured back. When he left the hospital she accompanied him to his home on a farm near Winslow where she remained for some six weeks, partly in the capacity of a guest, and partly as a nurse. There she met plaintiffs, Viva Stalder, Lawrence's sister, and her husband, Adolph Stalder. Thereafter defendant spent many· vacations at their home.

In 1942 Adale Stauske was commissioned as a second lieutenant in the Army, and on the boat going overseas she became very well acquainted with the alleged father of the child involved in this adoption. They continued their intimacy when they were stationed together at New Caledonia, and spent week ends together. Defendant testified that she first learned that he was already married when she informed him that she had become pregnant. She hesitated to have an abortion, she stated, because of lack of skill found in the available personnel.

She was eventually sent back to San Francisco, and the Army severed connections with her. The child was born in a San Francisco hospital where defendant continued to

live on the pretext that she was a patient. Upon her discharge she left the child in that city with some nurse, and went to her sister's home in River Forest, Illinois, where she remained for over two months, pretending to be on a leave of absence from the Army. She invented the story that she had befriended Jane Stone, an unwed mother who had a child whose father was killed in action and that since the girl's parents would have nothing to do with her if they learned of an illegitimate child, defendant wanted to bring the child back with her.

Defendant and the child moved in with the sister, her husband and children, and remained there for about two years until the sister became ill and could no longer assume the additional responsibility of the baby. Defendant thereupon, with the assistance of Lawrence Rhode, with whom she had resumed her affair, drove around the community to find a home for the child. Unable to find a place, they brought the child to plaintiffs' home at Winslow where the child was left for some ten days. He was then taken to another prospective home at Midlothian, and when he was rejected there because he cried all night and disturbed the neighbors, he was returned to plaintiffs' home where he has remained until the present time.

The evidence in regard to the understanding of the parties and the conversations had when the child was left with plaintiffs is meager and conflicting. Defendant testified that she told plaintiffs they could never adopt the child and they agreed to keep him for $50 per month support money. Plaintiffs deny this and say nothing was said about adoption and no arrangement or agreement was entered into. The evidence does show that defendant sent a money order for $50 after the child was with plaintiffs for a month but no further payments were ever made. Defendant or her sister did send small gifts, sometimes of used clothing of the sister's children, a very few times. These things were

sent for Jane Stone's child. During this two-year period defendant lived in Chicago about 120 miles away and never came to see the child except one time when she came to Winslow, Illinois, where plaintiffs lived, to attend the funeral of Lawrence Rhode who was killed in an automobile accident.

At the first trial she explained her failure to see the child for the prolonged period by the fact that she was under constant treatment for allergic rhinitis and dermatitis; however, on the second trial, when confronted with certain evidence, she admitted that she had been busy, at least part of the time, in endeavoring to procure an abortion. She also claimed that she was mistaken about the suspected pregnancy during 1947, although she admitted having sexual relations with some man during this time, and having written letters to the doctor who served the community of Winslow for some 25 years, in which she described in detail her attempts to abort herself, her symptoms, and her search for a physician who would perform an abortion, and also requested funds so that she could pay for such an operation. The doctor testified that she came to the community for an examination late one night, and that the examination revealed her to be pregnant and that she was so informed.

When defendant learned of plaintiffs' intentions to adopt the child, she revealed for the first time that she was the natural mother, 'and had been endeavoring to find a father for the child. She explained that she had not visited them because she was grieving over the death of Lawrence Rhode and the area reminded her of their courtship. The record does not disclose whether Lawrence Rhode knew that their courtship had been interrupted by the affair in the South Pacific.

Defendant at the trial avowed intentions of marrying one Norv Vaughn, an unhappily married man of 50, who

then had a living wife and adult children. Defendant attended Vaughn while he was in the hospital with a heart ailment, met his children, and knew of his marital status. Notwithstanding that fact, defendant and Vaughn had numerous visits alone together at her apartment, some extending through the night. One such visit was weakly explained by the statement that Vaughn had a mild heart attack while there visiting, and therefore had to remain at defendant's apartment all night.

The record is replete with evidence, including even the testimony of defendant and that of her sister, that plaintiffs are stable, respected members of the community, and have devotedly cared for the child. In fact, defendant admitted that there never would be enough money to pay plaintiffs for the excellent care they gave the boy.

On the basis of substantially the foregoing evidence the county court, at the conclusion of the second trial, at which the additional evidence of defendant's alleged abortion and other illicit conduct was adduced, allowed plaintiffs' petition for adoption of James Robert Stone, and ordered that his name be changed as requested.

As hereinbefore noted, the Appellate Court reversed that order. On this appeal plaintiffs assert that the omissions of fact in the opinion of the Appellate Court, partially on grounds of judicial propriety, create an incomplete and inaccurate picture of the character and conduct of the natural mother who is contesting the adoption of this 8-year-old boy by the only parents he has ever known. Defendant contends not only that the judgment of the Appellate Court should be affirmed, but that the county court committed further error in allowing the motion to vacate the first order, and in admitting certain evidence with reference to the alleged abortion.

We find no merit in defendant's technical objection that the motion to vacate the original order denying adoption was fatal in form because it did not allege diligence on

plaintiffs' part to present the allegedly new evidence at the first trial. Plaintiffs' motion to vacate was supported by affidavits setting forth the alleged pregnancy and abortion, facts which ordinarily are not discovered by "reasonable diligence." Moreover, it was only after the first trial when the facts of the child's birth were brought out, and some insight was had into defendant's past, that it became apparent that further investigation might reveal other conduct following the same pattern. The ensuing diligent investigation did reveal such facts, and they were alleged in the motion to vacate, which was filed within the proper time, and, under those circumstances, there could be no charge of failure to exercise or allege diligence.

Defendant's contention that the original petition for adoption could not be amended to include the additional facts respecting defendant's conduct and character, since they constituted a new cause of action, is also untenable. The cause of action herein was essentially a proceeding for the adoption of James Robert Stone by plaintiffs, and it was the same in both the original and amended petitions, hence the amendment alleging additional facts bearing thereon was proper, particularly in the light of section 39 of the Civil Practice Act (Ill. Rev. Stat. 1947, chap. 110, par. 163,) which provides in substance that supplemental pleadings setting up matters which have arisen after the original pleadings were filed may be filed within a reasonable time by either party.

With reference to the admission of defendant's testimony concerning her abortion and indiscretions in the spring of 1947, there could be no infringement of any constitutional privilege, since her deposition, taken without claim of privilege, covered the subject matter and constituted a waiver of any right to claim privilege.

In determining whether grounds for adoption are established, the Illinois courts have held that abandonment under the Adoption Act means any conduct on the part of a

parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. (*Hill* v. *Allabaugh,* 333 Ill. App. 602.) The evidence here respecting the abandonment and desertion of the child reveals that at no time prior to this proceeding did defendant acknowledge the child as her own, in fact her own sister did not know the child was defendant's until two days before she testified at the trial. Defendant's entire contact with the child is characterized by efforts to get rid of him. The first few months of his life the boy was left with a stranger in San Francisco while defendant took that length of time allegedly to make arrangements to bring the child to her sister's home under the pretext that he was the illegitimate child of a friend. Defendant then left the child in the care of her sister and was free to resume her affair with Lawrence Rhode until the sister became too ill to assume the additional responsibility, whereupon defendant tried to find a place for the child by driving around the neighborhood. At one of the homes where the baby was left he cried all night, and was therefore rejected because the neighbors were annoyed.

After the child was left at plaintiffs' home, with no assurance that defendant or his mythical mother, Jane Stone, would ever return for him, nor any arrangements made for his support, defendant did not see the child for over two years, except for a visit incidental to attending the funeral of Lawrence Rhode, even though defendant lived only 120 miles away. Her preoccupation with the alleged abortion obviously did not extend over the entire two-year period, nor excuse her failure to have any contact with the child or make any contribution for his support, or fulfill any parental obligation, legal or moral. Nor was there any intimation from her conduct that she ever intended to assume care of the child. Defendant had merely acted as an agent for some unknown parent in finding a

refuge for the child. She even gave up the idea of taking out an educational policy for the boy when she would have to sign an affidavit for she "did not want to get in any deeper."

It is apparent that had defendant died before this proceeding the child could not have proved his right to inherit from her, and at no time could defendant have been required to fulfill a single legal duty in connection with the mother-child relationship from the time the child was born until these proceedings were commenced on May 25, 1948.

Under these circumstances, the case is clearly distinguishable from *In re Bistany*, 239 N.Y. 19, cited by the Appellate Court, wherein the adoption petition was denied on the ground that the sole factor evidencing abandonment was the parents' failure to make contributions for the support of the child whom the parents had acknowledged. In the instant case, however, defendant's failure to send money for the care of the child was merely one factor in the pattern of conduct evidencing a purpose to forego all parental duties.

The instant case is also distinguishable from *Hill* v. *Allabaugh* in which the adoption petition was denied, inasmuch as the parent contesting the adoption therein not only recognized and regarded the child as his own, but intermittently sent him money and gifts and bought war bonds and an insurance policy for the child's education, and did nothing that indicated an attitude of desertion or abandonment.

On the basis of our analysis of the facts here in the light of the judicial determinations, it is our judgment that despite defendant's protestations of her ultimate intentions at the trial, her conduct constituted abandonment of the subject of this adoption proceeding, and afforded a proper ground for allowing plaintiffs' petition. Moreover, inasmuch as the Adoption Act specifies "desertion"

for six months prior to the institution of proceedings, in addition to abandonment, thereby evidencing a legislative intent that the grounds of desertion and abandonment are distinguishable (*Hill* v. *Allabaugh,*) it is apparent that even if defendant's conduct did not constitute abandonment of the child, it clearly amounted to desertion within the terms of the statute.

Plaintiffs' adoption petition may also be sustained on the further ground that the evidence establishes that the natural parent was unfit by reason of depravity. The term "depravity" is not defined in the statute, or in the Illinois cases; however, in 26 C.J.S. 975, it is defined as "an inherent deficiency of moral sense and rectitude." Admittedly, bearing a child out of wedlock would not alone indicate depravity, but where the affair resulting in the birth of the child is but one of a series, conducted both before and after the birth, with different persons, some of whom were known to be already married, and where abortion and perjury are resorted to without moral trepidation, then it can properly be found that there is an inherent deficiency of moral sense and rectitude constituting the "depravity" of character contemplated by the statute.

The evidence of unfitness of the natural parent is clear and satisfactory to this court. Moreover, it is apparent that the best interests of the child are with those who have unstintingly given him care, love and a sense of belonging, and who can, apparently, be depended upon to continue to do so. We recognize the superior right in a parent to the custody of her child but, under this evidence, that right must yield to the best interest of the child. (*Cormack* v. *Marshall,* 211 Ill. 519, 527.) The trial judge, who saw and heard the parties and the witnesses, obviously came to the same conclusions and we think his judgment was correct.

In light of the foregoing, it is our judgment that the Appellate Court erred in reversing the order of the county court, and therefore, the judgment of the Appellate Court

must be reversed and the order of the county court is affirmed.

*Appellate Court reversed; county court affirmed.*

Mr. JUSTICE BRISTOW took no part in the consideration or decision of this case.

Mr. JUSTICE CRAMPTON, dissenting:

I am compelled to dissent. This is an adoption proceeding, not a custody determination. The majority opinion fails to mention the very important fact, admitted by both sides on oral argument, that the mother of the boy is now married to Vaughn. For the first time, this distraught woman is in a position, we can assume, to make a home for her boy and give him the care and nurture he deserves. If her rehabilitation is not effected or complete, that question may be adjudicated in a different type of proceeding. On the other hand, to forever deprive this mother of her son, is, it seems to me, a grave injustice. To take away from a natural mother all of her rights to an illegitimate child simply because her morals, subsequent to the birth of the child and while living separate and apart from the child, are called into question, is an act without authority or sanction in law. And if there were any such authority, to do so will keep the courts very busy, indeed.

The only pertinent question in this case is whether or not the defendant abandoned her son under facts and circumstances which will support the decree of the lower court. Certainly, her ability to pay for his keep during her checkered and varied career is not alone sufficient to constitute an abandonment, especially where payments are waived or none are requested. The Appellate Court, after a careful examination of all of the evidence in this record, decided there was no abandonment or desertion. This is the same conclusion the trial court originally reached and entered a decree denying adoption but later vacated this

decree and allowed the adoption on the ground the respondent was a depraved person and that she was guilty of open and notorious fornication. We may inquire, until the final order, what has been, since her marriage, the extent of her restoration. Are we to say this woman shall be denied the only highway of return to wholesomeness and send her, with all convenient speed, on down the road to perdition? And about the best interests of the child! Is he better off to be taken to his natural mother's breast at this still tender age and readily make his adjustment or wait until he later learns the inevitable truth untempered by any association with his mother. It might be said many children would perhaps be better off in adopted homes but this is not a ground for adoption.

The Appellate Court in an able and careful opinion decided the issues in this case. (See *Stalder* v. *Stone,* 344 Ill. App. 266.) The Appellate Court was correct and its judgment should have been affirmed.