# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Addison R.*, 2013 IL App (2d) 121318

---

| | |
|---|---|
| Appellate Court Caption | *In re* ADDISON R., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Megan Z., Respondent-Appellant (Rodney R., Respondent)). |
| District & No. | Second District<br>Docket No. 2-12-1318 |
| Filed | March 21, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The termination of respondent's parental rights based on a finding of unfitness due to depravity was upheld, since her convictions for aggravated battery to a police officer and aggravated fleeing following an incident in which she ingested cocaine, started driving and then refused to stop for police demonstrated an inherent deficiency of moral sense and rectitude, a total disregard for her child's welfare and a complete lack of respect for the welfare of other persons. |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 10-JA-155; the Hon. Mary Linn Green, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael W. Raridon, of Rockford, for appellant.

Joseph P. Bruscato, State's Attorney, of Rockford (Lawrence M. Bauer and Matthew J. Schmidt, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices Jorgensen and Spence concurred in the judgment and opinion.

**OPINION**

¶ 1    Respondent-mother, Megan Z., appeals from the trial court's judgment terminating her parental rights to her daughter, Addison R. Respondent-father, Rodney R., ultimately consented to Addison's adoption by a paternal aunt; he is not a party to this appeal. Respondent-mother argues only that the trial court's finding that she was unfit was against the manifest weight of the evidence. For the following reasons, we affirm.

¶ 2                                    BACKGROUND

¶ 3    Addison was born on April 25, 2008. From July 21, 2009, until June 1, 2010, Addison and her parents were involved in "intact services" managed by the Department of Children and Family Services (DCFS). Addison initially came to DCFS's attention on July 5, 2009, when it received a hotline telephone call about domestic violence between respondent-mother and respondent-father, during which respondent-father "beat up [respondent-mother] in the presence of their daughter." Respondent-mother also had a long-term cocaine addiction. DCFS instituted a safety plan under which respondent-mother and respondent-father voluntarily placed Addison with a paternal aunt, Tongela[1] W. During Addison's placement with Tongela, respondent-mother engaged in mental-health and substance-abuse treatment programs.

¶ 4    According to a report from the Children's Home and Aid agency (the child welfare agency working with DCFS), respondent-mother was "close" to having Addison returned home when she was arrested on March 1, 2010, following a police chase through three counties. During the chase, respondent-mother backed her vehicle into a police detective. Respondent-mother pleaded guilty and was convicted of aggravated battery to a police

_____

[1]Tongela's name is spelled differently throughout the record. We adopt the spelling that she provided to the court at the permanency review hearing on November 29, 2011.

-2-

officer, a Class 1 felony, in De Kalb County (No. 10-CF-167), and was sentenced to eight years' imprisonment. Respondent-mother was also convicted, following guilty pleas, of aggravated fleeing, a Class 4 felony, in both Winnebago County (No. 10-CF-693) and Kane County (No. 10-CF-568). She was sentenced to one year and two years' imprisonment, respectively, to be served concurrently with the De Kalb County sentence.

¶ 5    On May 14, 2010, the State filed a three-count petition in the circuit court of Winnebago County, alleging that Addison was a neglected minor under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2010)). Count I alleged that Addison was neglected based on an environment injurious to her welfare in that her parents engaged in domestic violence in her presence, thus placing her at risk of harm. Counts II and III alleged neglect based on an injurious environment in that respondent-mother and respondent-father, respectively, each had a substance abuse problem that prevented proper parenting, thus placing Addison at risk of harm.

¶ 6    On June 1, 2010, the trial court conducted a shelter care hearing. The court entered an order finding probable cause to believe that Addison was neglected and granting temporary guardianship and custody to DCFS.

¶ 7    On September 9, 2010, the trial court conducted an adjudicatory hearing, at which respondent-father stipulated to the facts alleged in count I of the petition. Respondent-mother agreed to respondent-father's stipulation. The court found that there was a factual basis supporting the plea. The court entered an order adjudicating Addison a neglected minor and dismissing counts II and III on the State's motion.

¶ 8    Three permanency review hearings followed. On March 8, 2011, the trial court found that respondent-mother had made reasonable efforts to follow the service plan and achieve the goal of return home within 12 months. The court made no finding as to respondent-mother's progress. The court maintained the goal at return home within 12 months. On August 30, 2011, the court again found that respondent-mother had made reasonable efforts. However, the court found that she had not made reasonable progress because of an alleged infraction of prison rules in May 2011 when contraband (pills) was found in her cell. The court continued the goal at return home within 12 months. On November 29, 2011, the court once more found reasonable efforts but no reasonable progress by respondent-mother. The court changed the goal to substitute care pending termination of parental rights. The court also granted DCFS leave to place Addison with Tongela in Georgia, which occurred on December 18, 2011.

¶ 9    On February 17, 2012, the State filed a motion for termination of parental rights, alleging that respondent-mother was unfit due to: count I, failure to maintain a reasonable degree of interest, concern, or responsibility as to Addison's welfare (750 ILCS 50/1(D)(b) (West 2010)); count II, depravity (750 ILCS 50/1(D)(i) (West 2010)); count III, failure to make reasonable progress toward Addison's return during the initial nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2010)); count IV, failure to make reasonable progress toward Addison's return during any subsequent nine-month period (750 ILCS 50/1(D)(m)(iii) (West 2010)); and count V, repeated incarceration preventing her from discharging her parental responsibilities (750 ILCS 50/1(D)(s) (West 2010)).

¶ 10     Section 2-29 of the Juvenile Court Act (705 ILCS 405/2-29 (West 2010)) provides a two-step process for termination of parental rights. *In re J.L.*, 236 Ill. 2d 329, 337 (2010). The trial court must first find by clear and convincing evidence that the parent is unfit as defined in section 1 of the Adoption Act (750 ILCS 50/1(D) (West 2010)). 705 ILCS 405/2-29(2), (4) (West 2010); *J.L.*, 236 Ill. 2d at 337. Then, the court must find by a preponderance of the evidence that termination of the parent's rights is in the child's best interests. 705 ILCS 405/2-29(2) (West 2010); *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 63.

¶ 11     On June 8, 2012, the court conducted an evidentiary hearing on the unfitness portion of the State's motion to terminate parental rights. At the outset of the hearing, respondent-father consented to Addison's adoption by Tongela. (Addison was still living with her in Georgia.) The State called the two caseworkers involved, who introduced the service plans they had created for respondent-mother and testified regarding her efforts and progress. The court admitted the State's exhibits 4, 5, and 6, which were certified copies of respondent-mother's convictions from De Kalb County, Winnebago County, and Kane County, respectively.

¶ 12     Respondent-mother testified on her own behalf. She said that her felony convictions were all based on "the same incident" on March 1, 2010. Respondent-mother explained that the incident began when she ingested $400 worth of cocaine with her ex-husband in Winnebago County. At some point after that, respondent-mother was driving. Although she could not recall why, she knew that police in Winnebago County tried to stop her and that she refused to do so. Respondent-mother drove into De Kalb County, where she hit a residential trailer. A police detective attempted to prevent respondent-mother from leaving that scene. Respondent-mother started her car and put it in reverse. Respondent-mother continued fleeing into Kane County, where she was eventually stopped sometime during rush hour.

¶ 13     When asked on cross-examination if she hit the detective, respondent-mother replied, "Not exactly." She acknowledged that she was convicted of aggravated battery for hitting the detective with her car. When asked what happened to the detective, respondent-mother said, "I guess she got injured. I don't know." Respondent-mother further testified that, at the time of the incident, Addison was in temporary placement with DCFS. She testified that at the time she was not thinking that her conduct could affect her ability to parent Addison.

¶ 14     Respondent-mother testified that, since her imprisonment in April 2010, she had been enrolled in substance abuse treatment known as the Wells program. She had progressed to the second of two levels prior to being discharged from the program as part of her discipline for the contraband incident in May 2011. Respondent-mother explained that prescription pills[2] were found in her cell, which she shared with another inmate. She testified that the pills were not hers but that both she and her cellmate were disciplined because neither would admit that the pills were hers. Respondent-mother had since reenrolled in the Wells program and had had no other infractions during her imprisonment. Respondent-mother further testified that, based on her participation in the Wells program, her original release date of

---

[2]According to the DCFS permanency hearing report filed with the court on August 30, 2011, 11 pills were found. Respondent-mother reported that there were nine antihistamine pills and two muscle-relaxant pills.

March 1, 2014, had been moved up to July 2, 2013.

¶ 15 Respondent-mother said that her discipline for the contraband incident also included "no contact" visits for six months, meaning that she saw visitors through a glass window and talked to them on a telephone. Her visits with Addison previously had consisted of sitting with Addison at a table or joining her in a play area. Respondent-mother agreed that she told her caseworker not to bring Addison to visit for those six months. She explained that she did not think it would be good for three-year-old Addison to "sit on a phone and talk" for two hours and that Addison was too young to understand the change in situation.

¶ 16 Respondent-mother next testified about her compliance with her service plan. She explained that the only mental health services available at the prison were brief, monthly psychiatric visits and prescription medication. Respondent-mother was compliant with the visits and with her medication for bipolar disorder and depression. Respondent-mother successfully completed the parenting class offered. Regarding domestic violence services, respondent-mother testified that she had repeatedly requested to be in the prison's program, was on the waiting list, and expected to engage in that service within a few weeks. She was also scheduled to take a stress management class after the domestic violence program. Respondent-mother took two anger management courses and classes known as "Road Map to Lifelong Recovery" and "Lifestyle Redirection." Respondent-mother additionally completed courses offered at the prison through Lake Land College, including a sanitation course, for which she received her sanitation license. She also finished a Lake Land College six-month restaurant management program in only four months. Respondent-mother thought she had taken advantage of every program offered by the prison.

¶ 17 Respondent-mother further testified that she was researching possible housing options for herself upon release and had contacted a halfway house as well as a friend. She explained that she had not been able to pursue employment opportunities due to her incarceration but planned to work in the food service industry and go to college to study culinary arts.

¶ 18 Respondent-mother testified that she had been unable to understand the effects of her behavior while she was under the influence but that she no longer wanted to use drugs or alcohol. She understood that her incarceration had "torn [her] family apart."

¶ 19 The trial court took the matter under advisement and rendered its ruling on June 29, 2012. The court found that the State had proved counts II, III, IV, and V (depravity, lack of reasonable progress in the initial nine-month period, lack of reasonable progress in any nine-month period, and repeated incarceration, respectively) by clear and convincing evidence. The court entered an order finding respondent-mother unfit.

¶ 20 On October 4, 2012, the trial court conducted the best-interests portion of the proceeding. On October 31, the court entered an order finding that it was in Addison's best interests to terminate respondent-mother's parental rights and changing the goal to adoption. On November 2, the court entered an order terminating respondent-mother's parental rights and granting DCFS the power to consent to adoption. Respondent-mother appeals.

¶ 22          Respondent-mother[3] argues that the trial court's finding of unfitness was against the manifest weight of the evidence (see *Julian K.*, 2012 IL App (1st) 112841, ¶ 65). We will reverse the trial court's finding of unfitness only if it was against the manifest weight of the evidence. *In re J'America B.*, 346 Ill. App. 3d 1034, 1045 (2004). A determination of unfitness is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or the determination is unreasonable, arbitrary, or not based on the evidence presented. *J'America B.*, 346 Ill. App. 3d at 1045.

¶ 23          Respondent first contends that the trial court's unfitness finding based on depravity was against the manifest weight of the evidence. Section 1(D) of the Adoption Act provides several grounds for unfitness, including a parent's depravity (750 ILCS 50/1(D)(i) (West 2010)). Although the legislature did not include a definition of depravity, our supreme court has defined depravity as "an inherent deficiency of moral sense and rectitude." (Internal quotation marks omitted.) *Stalder v. Stone*, 412 Ill. 488, 498 (1952); *In re A.M.*, 358 Ill. App. 3d 247, 253 (2005). Our legislature created "a rebuttable presumption that a parent is depraved if the parent has been criminally convicted of at least 3 felonies ***; and at least one of these convictions took place within 5 years" of the filing of the motion to terminate parental rights. 750 ILCS 50/1(D)(i) (West 2010). Here, the trial court admitted into evidence certified copies of respondent's three felony convictions, all of which were within five years of the State's motion to terminate. Thus, there was a rebuttable presumption of respondent's depravity. *A.M.*, 358 Ill. App. 3d at 253 (stating that the State's evidence, including three certified copies of felony convictions, created a rebuttable presumption of the respondent's depravity).

¶ 24          "Because the presumption is rebuttable, a parent is still able to present evidence showing that, despite her convictions, she is not depraved." *In re Shanna W.*, 343 Ill. App. 3d 1155, 1166 (2003). Once the parent produces evidence opposing the presumption, "the presumption ceases to operate, and the issue is determined on the basis of the evidence adduced at trial as if no presumption had ever existed." *In re J.A.*, 316 Ill. App. 3d 553, 562 (2000).

¶ 25          Here, to rebut the presumption of depravity, respondent testified on her own behalf. She explained that her convictions were the result of her conduct over the course of one day while she was impaired by cocaine and by her mental health issues. Respondent testified about her participation in the Wells program and said that she no longer wanted to use drugs or alcohol. She was compliant with medication and psychiatric visits. Respondent noted that she had no infractions of prison rules other than the contraband incident. She testified that she had pursued every program offered by the prison, including college courses to enhance her employment opportunities. Respondent had also researched her prospective housing options.

¶ 26          Given that respondent produced evidence to rebut the presumption of depravity, the trial court was to decide the issue based on all of the evidence adduced, as if the presumption never arose. *J.A.*, 316 Ill. App. 3d at 562. In our review, we are mindful of the deference we

---

[3]From this point, we will refer to respondent-mother as respondent, since respondent-father is not a party to this appeal.

are to give to the trial court's finding of depravity in light of its ability to "closely scrutinize [respondent's] character and credibility." *J.A.*, 316 Ill. App. 3d at 563. On the record before us, we conclude that the trial court's finding of unfitness based on depravity was not against the manifest weight of the evidence because a conclusion that respondent was not depraved or had been rehabilitated was not clearly evident. See *J'America B.*, 346 Ill. App. 3d at 1045 (noting that a decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or the determination is unreasonable, arbitrary, or not based on the evidence presented).

¶ 27　The evidence demonstrated that respondent's conduct resulting in her convictions was extremely serious and indicative of an inherent deficiency of moral sense and rectitude. Respondent began the day on March 1, 2010, by ingesting a large amount of cocaine. She proceeded to drive and refused to stop for police in Winnebago County. Respondent agreed during her testimony that she *chose* not to stop. She then led police on a car chase into De Kalb County, where she hit a residential trailer. Without determining whether anyone was injured, respondent continued fleeing by backing her vehicle into a police detective. According to the complaint in the De Kalb County case, the detective suffered great bodily harm to her right shoulder and left knee, "including but not limited to internal deformation." We note that, even on the "cold" record before us, respondent seemed almost nonchalant about her conduct, testifying that she did "[n]ot exactly" hit the detective and that she "guess[ed]" that the detective was injured but she did not know. Even after hitting the detective, respondent continued to flee police by driving into Kane County, where eventually she was stopped. Respondent also acknowledged during her testimony that her conduct occurred while Addison was already in temporary placement. Respondent's conduct evinces not only a total disregard for Addison's welfare, but also a complete lack of respect for the welfare of other persons in her path.

¶ 28　In addition to respondent's March 1, 2010, conduct, the record contains other evidence of her depravity. Reports filed with the court by both DCFS and Children's Home and Aid reflect respondent's history of involving herself in relationships marked by domestic violence. Despite an order of protection against respondent-father, respondent returned to live with him, even though Addison was a protected person under the order. The reports also reveal respondent's repeated use of cocaine and her positive drug drops, even while she was participating in safety plans to achieve Addison's return home. Further, the reports indicate that respondent had three older children (born in 1998, 2003, and 2004), who, though not involved with DCFS, were voluntarily placed with various family members. Whether this fact evinces respondent's unwillingness to care for her children or her recognition of her inability to do so because of the choices she made, it is further evidence of an inherent deficiency of moral sense and rectitude. On this record, respondent's March 1, 2010, conduct was the culmination of a history of depravity.

¶ 29　Furthermore, the prison's finding that respondent had contraband in her cell also supports the trial court's finding of depravity. Respondent argues on appeal that, because the prison's

finding was based on only "some evidence," she was not afforded due process.[4] Therefore, according to respondent, the infraction cannot constitute clear and convincing evidence of unfitness. While we agree that the contraband incident itself was not proven by clear and convincing evidence, the incident was, nevertheless, part of the State's evidence of respondent's depravity that the trial court could properly consider.[5]

¶ 30     Notwithstanding respondent's argument to the contrary, her efforts in prison, while commendable, were insufficient evidence of rehabilitation or lack of depravity. See *A.M.*, 358 Ill. App. 3d at 254 (stating that "completion of classes in prison, while *** commendable, does not show rehabilitation"); *Shanna W.*, 343 Ill. App. 3d at 1167 ("Receiving a few certificates for completing basic services in prison, while commendable, is not a difficult task and does not show rehabilitation."). Nor can we conclude that, even assuming that respondent was not responsible for the contraband found in her cell, respondent's good behavior while imprisoned was particularly probative, given that she was in a controlled environment. See *Shanna W.*, 343 Ill. App. 3d at 1167 (reasoning that rehabilitation "can only be shown by a parent who leaves prison and maintains a lifestyle suitable for parenting children safely"); *In re Adoption of Kleba*, 37 Ill. App. 3d 163, 166 (1976) (rejecting as evidence of the father's rehabilitation that he had not gotten into trouble while in prison, noting that his "opportunity to commit further criminal acts ha[d] been severely restricted" since his imprisonment).

¶ 31     Respondent urges that her convictions are not indicative of depravity because they were the result of her addiction and mental health issues. Respondent offers no authority in support of this proposition but maintains that no Illinois case has held that addiction constitutes depravity. Yet, in *Shanna W.*, the court affirmed the trial court's finding of depravity and rejected the respondent's argument that her drug-related convictions did not demonstrate an inherent deficiency of moral sense and rectitude. *Shanna W.*, 343 Ill. App. 3d at 1167. Although unlike respondent the respondent in *Shanna W.* took cocaine while pregnant (*Shanna W.*, 343 Ill. App. 3d at 1167), the trial court here could have found that respondent similarly inflicted her drug problem on Addison, in light of the chaos it engendered in Addison's life. In any event, because respondent's argument is unsupported by authority, it is forfeited. *Alvarez v. Pappas*, 374 Ill. App. 3d 39, 44 (2007) (an argument raised on appeal but not supported by citation to relevant authority is forfeited under Illinois Supreme Court Rule 341(h)(7) (eff. July 1, 2008)).

¶ 32     Respondent further argues that, because she had no serious criminal history[6] and all of

---

[4]Respondent raises this argument in connection with the court's finding of lack of reasonable progress.

[5]We also note that the fitness hearing was not the first time that the court (Judge Green) had heard about the contraband incident. The incident was the basis for the court's finding of no reasonable progress by respondent at the second permanency review hearing on August 30, 2011.

[6]State's exhibit 4 includes the De Kalb County State's Attorney's statement of facts, which indicates that respondent had only two prior misdemeanor convictions, of theft and obstructing

-8-

the conduct giving rise to her felony convictions occurred on one day, her alleged acts of depravity were of insufficient duration and lacked the repetition necessary to support a depravity finding. In support of her position, respondent relies on *In re M.B.C.*, 125 Ill. App. 3d 512, 514 (1984), wherein the court stated, "Acts constituting depravity must be of sufficient duration and repetition to establish moral deficiency and either an inability or unwillingness to conform to accepted morality." The court in *M.B.C.* applied this proposition of law to reject the father's argument that evidence of his criminal convictions some 20 years earlier was irrelevant, concluding that those convictions, taken with the one at issue, "reveal[ed] a pattern of criminality." *M.B.C.*, 125 Ill. App. 3d at 514. Significantly, when *M.B.C.* was decided, section 1(D)(i) of the Adoption Act did not yet provide for the current rebuttable presumption of depravity based on three felony convictions. See *In re T.T.*, 322 Ill. App. 3d 462, 463 (2001) (noting that an amendment (Pub. Act 90-608, § 40 (eff. June 30, 1998)) added this provision). Moreover, the Adoption Act provides no exception for cases in which the conduct giving rise to the three felony convictions occurred on the same day. In amending section 1(D)(i), the legislature approved the use of three felony convictions alone to create a *prima facie* case of depravity. *T.T.*, 322 Ill. App. 3d at 466.

¶ 33 Additionally, our research reveals that the "boilerplate" language requiring the depraved acts to be "of sufficient duration and of sufficient repetition" was first recited in *Young v. Prather*, 120 Ill. App. 2d 395, 397 (1970)–a case that also predated the amendment. In announcing this requirement, the court in *Young* relied on *Stalder*. However, the court in *Stalder* simply noted that having one child out of wedlock did not constitute depravity but that having a series of affairs with different men could. *Stalder*, 412 Ill. at 498. It did not hold that all depraved acts must be of sufficient duration and repetition. Thus, even preamendment, the applicability of the boilerplate language was not necessarily universal. In light of the amendment, unless the legislature sees fit to create an exception, the applicability of the sufficient-duration-and-repetition requirement to cases involving three felony convictions is eliminated.

¶ 34 Finally, we note that, even preamendment, our supreme court held that one murder conviction[7] was sufficient to uphold the trial court's finding of depravity based on the nature of the single act. *In re Abdullah*, 85 Ill. 2d 300, 307-08 (1981) (where the victim was the child's mother, and the extended-term sentence indicated that the father's behavior had been exceptionally brutal and heinous). Here, even assuming *arguendo* that respondent's conduct on March 1, 2010, constituted a single act, it still supported the trial court's finding of unfitness based on depravity. As discussed above, the very nature of respondent's conduct evinced a complete disregard not only of the effect it would have on Addison but also of the human life jeopardized.

---

justice.

[7]Section 1(D)(i) currently provides for a presumption of depravity, rebuttable only by clear and convincing evidence, when the parent has been convicted of first-degree murder, second-degree murder of the other parent of the child at issue, or first- or second-degree murder of any child. 750 ILCS 50/1(D)(i) (West 2010).

¶ 35     Because we affirm the trial court's finding of unfitness on the ground of depravity, we need not address respondent's contentions regarding the other bases of unfitness.[8] *Julian K.*, 2012 IL App (1st) 112841, ¶ 2 (stating that a single ground of unfitness under section 1(D) is sufficient to support a finding of unfitness). Moreover, as respondent does not contest the trial court's best-interests finding,[9] we conclude that the court's order terminating respondent's parental rights was appropriate. *In re Richard H.*, 376 Ill. App. 3d 162, 166 (2007).

¶ 36     Based on the foregoing, we affirm the judgment of the circuit court of Winnebago County.

¶ 37     Affirmed.

---

[8]We note, however, that the State confessed error in the trial court's finding that respondent was unfit due to repeated incarceration. See 750 ILCS 50/1(D)(s) (West 2010).

[9]In her reply brief, respondent asserts that she intentionally raised no argument about the trial court's best-interests finding and requests that we ignore the State's contention that respondent forfeited any such argument. We agree that the State's contention was unnecessary.