NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190834-U

NO. 4-19-0834

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 20, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* J.P., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | No. 15JA186 |
| v. | ) | |
| Julian P., | ) | Honorable |
| Respondent-Appellant). | ) | Karen S. Tharp, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Knecht and DeArmond concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The trial court did not err in terminating respondent's parental rights.

¶ 2   Respondent, Julian P., appeals the trial court's termination of his parental rights to his minor child, J.P. (born April 13, 2013). He argues the court erred in finding him unfit and that termination of his parental rights was in J.P.'s best interest. We affirm.

¶ 3                     I. BACKGROUND

¶ 4   Respondent and Karmeletta W. are the parents of J.P. Karmeletta is also the mother of I.B. (born April 25, 2009), J.P.'s older half-brother. In October 2015, the Illinois Department of Children and Family Services (DCFS) took protective custody of the minors after Karmeletta attempted to shoplift items from a shopping mall while the minors were with her and then fled the scene, abandoning the minors, when mall staff tried to detain her. The same month, the State filed

petitions asking the trial court to adjudicate the minors neglected, both in the underlying case involving J.P. (Sangamon County case No. 15-JA-186) and in a separate case involving I.B. (Sangamon County case No. 15-JA-185).

¶ 5        In May 2016, Karmeletta admitted the minors were neglected based on allegations that they were not receiving the proper care and supervision necessary for their well-being due to her failure to make a proper care plan for them. The trial court then entered a written adjudicatory order, finding both minors were neglected. In June 2016, the court entered a dispositional order, making the minors wards of the court and placing them in the custody and guardianship of DCFS.

¶ 6        In August 2018, the State filed a motion to terminate respondent's parental rights to J.P. We note the State also sought to terminate the parental rights of Karmeletta (as to both minors) and I.B.'s father (as to I.B.) and that, ultimately, their parental rights were terminated. Because neither of those individuals is a party to this appeal, we discuss the facts and issues only as they relate to respondent and J.P.

¶ 7        Relevant to this appeal, the State alleged respondent was unfit to parent J.P. because he (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to J.P.'s welfare (750 ILCS 50/1(D)(b) (West 2016)); (2) failed to make reasonable efforts to correct the conditions that were the basis for J.P.'s removal from his care from May 12, 2016, to February 12, 2017 (*id.* § 1(D)(m)(i)); (3) failed to make reasonable efforts to correct the conditions that were the basis for J.P.'s removal from his care from February 12, 2017, to November 12, 2017 (*id.*); (4) failed to make reasonable progress toward J.P.'s return to his care from May 12, 2016, to February 12, 2017 (*id.* § 1(D)(m)(ii)); (5) failed to make reasonable progress toward J.P.'s return to his care from February 12, 2017, and November 12, 2017 (*id.*); and (6) was depraved, in that he

had been convicted of at least three felonies, one of which occurred within five years of the State's termination motion (*id.* § 1(D)(i)). The State further alleged that termination of respondent's parental rights was in J.P.'s best interest.

¶ 8        In November 2018, and February and March 2019, the trial court conducted fitness hearings in the matter. At the State's request, and without objection from respondent, the court took judicial notice of certified copies of respondent's prior felony convictions, which included: (1) a 2017 conviction for being a felon in possession of a firearm (federal case No. 16-30008-001) for which respondent was still imprisoned, (2) a 2017 conviction for distribution of crack cocaine (federal case No. 16-30008-001), (3) a 2015 conviction for possession of a weapon by a felon (Sangamon County case No. 15-CF-803), (4) a 2013 conviction for possession of a weapon by a felon (Sangamon County case No. 13-CF-320), and (5) a 2011 conviction for unlawful possession of a firearm (Peoria County case No. 11-CF-674).

¶ 9        The State further presented the testimony of several witnesses. Emily Roberts testified she was J.P.'s caseworker with the Center for Youth and Family Solutions (CYFS) from January 2016 to July 2017. After becoming J.P.'s caseworker in 2016, Roberts learned respondent was incarcerated and that his scheduled release from custody was "several years away." She testified respondent had no service plan tasks because he was incarcerated. Nevertheless, Roberts contacted respondent by letter and provided him with her contact information and copies of the service plans. She testified she was unable to have regular contact with respondent because of his incarceration and that he did not ever reach out to her. According to Roberts, respondent had no visits with J.P. and did not send J.P. any gifts, cards, or letters.

¶ 10    Rebekah Johnson testified she was J.P.'s CYFS caseworker from July 2017 to August 2018. During that time, respondent's only service plan task was to engage in and complete an integrated assessment; however, an assessment was never completed because it "ended up getting put to the bottom and just did not get scheduled." Johnson testified she attempted to contact respondent in prison by sending him a letter but was unsuccessful. She did speak with respondent at a court hearing. During that in-person contact, Johnson gave respondent her contact information, encouraged him to write to her, and informed him "that he could send letters and things to the agency." Ultimately, Johnson did not receive any communication from respondent while she was J.P.'s caseworker. She stated respondent did not have any visits with J.P. because he was incarcerated in a federal prison located outside of Illinois. Johnson also testified that respondent did not send any gifts, cards, or letters to J.P.

¶ 11    Cybil Hoffman testified she was J.P.'s case aide from November 2015 until May 2018. During that time, respondent and J.P. had one phone call. However, Hoffman did not know any details about the call.

¶ 12    Jacqueline Dean testified that she was J.P.'s current caseworker and had been since August 2018. During that time, she did not have any contact with respondent. Dean stated she tried to contact respondent by calling the federal prison he was in; however, she was unable "to get ahold of him." She did not send respondent any letters or attempt to complete an integrated assessment with him. Due to respondent's incarceration, Dean was never close to returning J.P. to his care.

¶ 13    Respondent called Karmeletta to testify on his behalf. Karmeletta stated she and respondent began a dating relationship in 2012 and lived together for a period of time during that

- 4 -

year. In March 2013, respondent was incarcerated, and in April 2013, J.P. was born. In 2014, respondent was released from custody and began residing with Karmeletta and J.P. They lived together until sometime in 2015. That same year, respondent was, again, incarcerated. According to Karmeletta, respondent had not been out of custody since 2015.

¶ 14        Karmeletta described respondent as "a good father." She explained he "was always present, and he catered to [J.P.'s] needs. And [J.P.] adored him." When respondent was incarcerated in 2015, he would send J.P. pictures and letters from prison. In Karmeletta's opinion, respondent "knew right from wrong" and was "a good person." Karmeletta testified that she did not "maintain contact with [respondent] today" and that she last spoke to him around Christmas 2017. She acknowledged that the two "didn't talk for very long," that they "just talked about the kids," and "didn't talk about [respondent] personally." Nevertheless, from that conversation, Karmeletta believed respondent had "matured since [he had] been gone. And it just sound[ed] like [he was] more responsible[.]" Further, although Karmeletta testified J.P. recognized respondent as her father, she acknowledged respondent had only been out of prison for "maybe two years" of J.P.'s life.

¶ 15        In March 2019, the trial court found respondent unfit as to each ground alleged by the State. In reaching its decision, the court referenced respondent's criminal history, noting that although respondent was young at the time his first offense was committed, "he never let up." The court also relied on the testimony of caseworkers that respondent did not send cards, letters, or gifts to J.P. while the case was pending. It concluded respondent had not rebutted the presumption that he was depraved, in that he had not shown that he could "be in the community and abide by the laws for which we are all expected to live and to stay out of prison and be a father to his child."

¶ 16        In May, June, October, and November 2019, the trial court conducted best-interest

hearings in the case. During the initial hearing in May 2019, the State presented Dean as a witness. Dean stated J.P. and I.B. were residing with Amber Day, their maternal aunt. At the time of the hearing, J.P. was six years old and had lived with Day since being removed from Karmeletta's care, a period of three years. Day had six children and that a total of nine people lived in the home. The children ranged from age 2 to age 14 or 15. Dean stated she observed the home and it was adequate for nine people and she had no safety concerns. She testified that J.P. loved Day and loved living in her home. Day was meeting all of J.P.'s educational, social, and medical needs and J.P. was doing well in school. Also, Day wanted to adopt both J.P. and I.B.

¶ 17     Dean acknowledged that I.B. was temporarily removed from Day's home in July 2018, following a fight with one of his same-age cousins. I.B. sustained scratches as a result of the fight. DCFS investigated and determined the incident was "unfounded." In January 2019, I.B. was returned to Day's home. According to Dean, I.B.'s removal from the foster home was "hard for" J.P. and caused her to have "some tantrums" after sibling visits with I.B. Dean stated J.P. was exhibiting some behavioral issues, including three instances of stealing but that Day was "address[ing] those concerns." She also acknowledged that J.P. was "picked on" by other children in the home but then elaborated that the children "pick[ed] on each other" and "[i]t's a back and forth kind of thing."

¶ 18     Dean also testified that during her time as J.P.'s caseworker, she was not aware of any interactions between respondent and J.P. She did not attempt to facilitate any contact between the two because "[J.P.] did not have any regards [*sic*] to who [respondent] was." Dean testified J.P. was "not really sure who [her] dad is" and had referred to other individuals as "[d]ad." To Dean's knowledge, J.P. had never had any contact with respondent's family. Further, she testified

that no one from respondent's family had ever reached out to her regarding J.P.

¶ 19 Dean agreed that her agency intended to keep I.B. and J.P. together and that, when I.B. was removed from Day's home, two other placement options where both children could be together had been considered. Dean testified it was ultimately decided not to remove J.P. from Day's home because she had been there for such a long period of time. Dean believed it was in J.P.'s best interest that respondent's parental rights be terminated based on the "longevity of the case" and because Day provided J.P. with a stable placement. Further, she noted that respondent was in federal prison and had "several years before he [would be] released."

¶ 20 In June 2019, the best-interest hearing was scheduled to resume. However, before the proceeding commenced, the parties and the trial court were informed that since the previous hearing, both I.B. and J.P. had been removed from Day's care and placed into a traditional foster home. By agreement of the parties, the matter was continued.

¶ 21 When the best-interest hearing continued in October 2019, the State recalled Dean. Dean reported that she stopped serving as the children's caseworker on July 17, 2019. On June 8, 2019, before she changed roles, I.B. and J.P. were removed from Day's care and placed in a traditional foster home. On June 20, 2019, I.B. was placed with his paternal grandmother, Ethel Pates, and J.P. was placed with fictive kin. According to Dean, the children were removed from Day due to a DCFS investigation into whether "there was neglect and lack of supervision in [Day's] home." Dean testified the allegations against Day were ultimately deemed "unfounded" and J.P. was returned to live with Day.

¶ 22 During the period she was removed from Day's home, J.P. expressed to Dean that

she wanted to return to live with Day. According to Dean, I.B. enjoyed living with Pates and desired to continue living with her. Further, Pates was willing to provide permanency for I.B. and to allow I.B. to maintain a relationship with J.P. Dean testified that although she had considered moving I.B. and J.P. to a foster home where they could live together, she decided against it because "[I.B.] wanted to stay with *** Pates, and *** [J.P.] had moved another time, and we did not want to move her again."

¶ 23     Dean testified she was "unsure" whether she continued to believe that termination of parental rights was in the children's best interests. She reasoned that at the time she stopped being the children's caseworker, J.P. had not been back in Day's home for very long and J.P. and I.B. were no longer living together. On questioning by the trial court, Dean stated her doubt was due to not knowing what had "been going on [in the case] since July," when she stopped being the children's caseworker. Finally, Dean acknowledged that respondent had written J.P. a letter but stated she knew of no other contact between the two.

¶ 24     The State next called Hoffman to testify. Hoffman stated she became the children's CYFS caseworker after Dean. She reported that I.B. continued to live with Pates and that Pates was willing to adopt him. J.P. remained with Day. According to Hoffman, J.P. was "making progress" in that placement. She was not having "any more problems at school" and all of her needs were being met. According to Hoffman, although J.P. and Day's other children had "fights like all kids do," J.P. stated she was happy living with Day and there was an attachment between J.P., Day, and the other children in Day's home. Day expressed a willingness to adopt J.P. and provide visits between I.B. and J.P. Hoffman testified that since J.P. was taken into care by DCFS in 2015, respondent had not had any visits with J.P. He also never had sole custody of her.

¶ 25     Hoffman further stated she had not "made up her mind as to what's in [the children's] best interests." Part of that reason was because, at that time, she observed no "ongoing active problems" with Karmeletta and because Karmeletta's parenting at visitations had been "sufficient."

¶ 26     The State next called Day as a witness. Day testified that she had been involved in J.P.'s life since before the underlying case arose. In August 2015, J.P. and I.B. were placed in her home in connection with a "safety plan." At some point, they were returned to Karmeletta's care but in October 2015, they were placed back in Day's home. Day testified that J.P. had been in her care since that time, except for the recent period in June 2019 when J.P. was removed pursuant to a DCFS investigation. Day stated she was willing to adopt J.P., provide for her medical and educational needs, and allow relationships between J.P. and her brother, her mother, and respondent. Day testified she knew Pates had been in contact with her before regarding I.B. and denied having "any issues" with her.

¶ 27     Day testified she had six children who also resided in her home. Her children ranged in age from 3 to 13, and she was currently pregnant with her seventh child. Day stated she worked as a certified nursing assistant (CNA) at a nursing home. She worked the night shift and stated her work had been reduced to three days a week because of her pregnancy. Day asserted she had a support system who helped with the children that included her father and brother.

¶ 28     Day acknowledged that J.P. had "behavioral issues, emotional issues, and sexual issues." She stated J.P.'s behavioral issues occurred at school and affected her academics. Day opined those issues resulted from J.P. seeking attention and "still want[ing] to be a baby." Day testified that J.P. had emotional issues in that she "has periods of time where *** she'll be crying

and she'll say *** she misses her brother." Finally, Day testified J.P. had exhibited "sexual behaviors," including masturbation, even before DCFS took custody of her in 2015. Regarding each of these issues, Day testified she was aware of them and was working to resolve them. She stated she intended to seek counseling for J.P. and noted she attended a recent meeting at J.P.'s school to discuss and address J.P.'s behaviors and academic achievement.

¶ 29        Day testified her family attended the same church as respondent's sister and that J.P. would see her aunt at church events. According to Day, J.P. knew respondent's name and knew he was her father, but she "ha[d]n't had a chance to rebuild that relationship." Once respondent was released from prison, Day was "open *** to letting [J.P.] develop that relationship."

¶ 30        The record reflects Pates also testified at the best-interest hearing. She believed that I.B. and J.P. needed to maintain a sibling relationship. She stated she would not allow I.B. to visit Day's home but did believe she could work together with Day to "foster a sibling relationship" between J.P. and I.B.

¶ 31        Respondent testified on his own behalf. He acknowledged being incarcerated days before J.P.'s birth and released in 2014, when she was approximately a year old. After his release, respondent lived with J.P. and Karmeletta "[a]t least for *** two months." In 2015, he was incarcerated again. Respondent agreed he was "incarcerated throughout the life of [the] case." He stated he expected to be released from prison in early 2021.

¶ 32        Respondent testified he knew Day prior to his incarceration. He asserted they never had a problem and "had a decent relationship." Respondent was aware that J.P. attended the same church as his sister, and he had been "keeping eyes" on J.P. through his sister. Respondent also asserted that he sent gifts, cards, or letters to J.P. "[a]ll the time."

¶ 33    Respondent maintained it was not in J.P.'s best interest to terminate his parental rights. He asserted J.P. "need[ed] her father, her real biological father" and he did not "feel like [he] did anything wrong." Respondent explained that he was 20 years old when he was incarcerated and, at that time, "was mentally somewhere that [he] shouldn't have been." According to respondent, he previously thought "breaking crimes [*sic*] and providing for [J.P.] the illegal way was the way to go about it." Now, he was "suffering from [his] actions" and understood that he "didn't just hurt [him]self, [he] hurt [J.P.] as well as others that surround her." Respondent was confident he had "changed [his] ways" during his incarceration. Upon his release from prison, he intended to enter a "half-way house," get a driver's license, get a job, and start his own business.

¶ 34    In November 2019, the trial court determined that termination of respondent's parental rights was in J.P.'s best interest. The court noted it had considered factors relevant to J.P.'s best interest and summarized the evidence as follows:

"I've not heard anything that [J.P.] is not doing well in the home of [Day]. *** [Day] stated that [she is] willing to provide permanence for [J.P.].

* * *

[J.P.] is in a home where she has been for most of her life. From the evidence I've heard, she is doing well there. ***

* * *

[Respondent], since he has been 17 years old, in 2011, he has shown an inability to stay out of prison to be a parent to [J.P.].

Right now, considering all of the issues, right now, [J.P. is] safe and being cared for. [She] do[es] have an identity, and [she is] with relatives right now.

- 11 -

\*\*\*

> [J.P. is] secure at this point. [She is in a home] that [she is] familiar with. There is affection for [J.P.] right now. The least disruptive [placement] right now is to leave [her] where [she is]."

Ultimately, the court found termination of respondent's parental rights was in J.P.'s best interest, relying on J.P.'s need for permanence; the length of time the case had been pending; respondent's continued imprisonment; and the length of time that would be needed to determine whether, after his release, respondent was "going to stay out of prison."

¶ 35   This appeal followed.

¶ 36   II. ANALYSIS

¶ 37   On appeal, respondent argues the trial court erred by terminating his parental rights to J.P. He challenges both the trial court's determination that he was unfit and its finding that termination was in J.P.'s best interest.

¶ 38   A. Fitness

¶ 39   Pursuant to the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-29(2) (West 2016)), a trial court may terminate parental rights where it finds, by clear and convincing evidence, that a parent is unfit based on grounds set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2016)) and that termination is in the minor's best interest. *In re M.I.*, 2016 IL 120232, ¶ 20, 77 N.E.3d 69. On review, the court's determination that a parent is unfit will not be disturbed unless it is against the manifest weight of the evidence. *Id.* ¶ 21. A court's decision "is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent." (Internal quotation marks omitted.) *Id.*

¶ 40        In this case, the trial court determined respondent was unfit based upon each of the six grounds alleged by the State. However, we need only consider whether any single ground of unfitness was sufficiently proven. See *In re Donald A.G.*, 221 Ill. 2d 234, 244, 850 N.E.2d 172, 177 (2006) ("Although section 1(D) of the Adoption Act sets forth numerous grounds under which a parent may be deemed 'unfit,' any one ground, properly proven, is sufficient to enter a finding of unfitness."). Here, the record sufficiently supports the court's finding that respondent was depraved pursuant to section 1(D)(i) of the Adoption Act (750 ILCS 50/1(D)(i) (West 2016)).

¶ 41        "Depravity" is defined as " 'an inherent deficiency of moral sense and rectitude.' " *In re J.A.*, 316 Ill. App. 3d 553, 561, 736 N.E.2d 678, 685 (2000) (quoting *Stadler v. Stone*, 412 Ill. 488, 498, 107 N.E.2d 696, 701 (1952)). Section 1(D)(i) of the Adoption Act states, "[t]here is a rebuttable presumption that a parent is depraved if the parent has been criminally convicted of at least 3 felonies *** and at least one of [those] convictions took place within 5 years of the filing of the petition *** seeking termination of parental rights." 750 ILCS 50/1(D)(i) (West 2016). A parent may rebut a presumption of depravity "with proof of rehabilitation or with evidence that the circumstances surrounding the crimes show the crimes did not result from depravity." *In re T.T.*, 322 Ill. App. 3d 462, 466, 749 N.E.2d 1043, 1046 (2001). "[O]nce evidence opposing the presumption comes into the case, the presumption ceases to operate, and the issue is determined on the basis of the evidence adduced at trial as if no presumption had ever existed." *J.A.*, 316 Ill. App. 3d at 562.

¶ 42        In this case, the State provided evidence of respondent's five felony convictions, three of which occurred less than five years prior to the date the State filed its motion to terminate respondent's parental rights. Thus, the State established a rebuttable presumption of depravity.

¶ 43    Respondent argues he rebutted the presumption of depravity by presenting evidence from Karmeletta that he was a good father, a good person, and had matured and become more responsible since his incarceration. We disagree and find respondent presented insufficient proof of his rehabilitation.

¶ 44    It has been held that rehabilitation "can only be shown by a parent who leaves prison and maintains a lifestyle suitable for parenting children safely." *In re Shanna W.*, 343 Ill. App. 3d 1155, 1167, 799 N.E.2d 843, 852 (2003); see also *In re Addison R.*, 2013 IL App (2d) 121318, ¶ 30, 989 N.E.2d 224 ("Notwithstanding respondent's argument to the contrary, her efforts in prison, while commendable, were insufficient evidence of rehabilitation or lack of depravity."). Here, respondent had a history that involved several felony convictions. He was incarcerated prior to J.P.'s birth, released from custody for approximately one year, and then reincarcerated in 2015. His incarceration continued throughout the pendency of the case. Although Karmeletta testified respondent had matured and become more responsible, as the State points out, she acknowledged that she had not been in recent contact with respondent and last spoke with him in December 2017. Additionally, she testified that during their last conversation they primarily "talked about the kids" and "didn't talk about [respondent] personally." Much of her testimony on respondent's behalf was based on her observations of him before his most recent period of imprisonment.

¶ 45    Given the evidence presented, we agree with the trial court's finding that respondent failed to show "that he c[ould] be in the community and abide by the laws [by] which we are all expected to live and to stay out of prison and be a father to his child." An opposite conclusion from the one reached by the court is not clearly apparent and, as a result, the court's finding that respondent was unfit based on the ground of depravity was not against the manifest weight of the

evidence.

¶ 46                                  B. Best Interest

¶ 47        Following a finding of parental unfitness, the trial court proceeds with the best-interest stage of termination proceedings where it "must give full and serious consideration to the child's best interest." *In re Jay H.*, 395 Ill. App. 3d 1063, 1071, 918 N.E.2d 284, 290 (2009). During this second stage of proceedings, the State has the burden of proving that termination is in the minor's best interest by a preponderance of the evidence. *In re D.T.*, 212 Ill. 2d 347, 366, 818 N.E.2d 1214, 1228 (2004). The Juvenile Court Act sets forth various factors for a trial court to consider when making a best-interest determination. See 705 ILCS 405/1-3(4.05) (West 2016). Those factors, which must be considered in the context of the child's age and developmental needs, include (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence; (8) the uniqueness of every family and child; (9) the risks associated with substitute care; and (10) the preferences of the persons available to care for the child. *Id.*

¶ 48        "[A] reviewing court will not reverse a trial court's best-interest determination unless it was against the manifest weight of the evidence." *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53, 74 N.E.3d 1185. "A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate [the court] should have reached the opposite result." *Id.* Additionally, the trial court's determination of a child's best interest is given great deference because that court "is in the best position to observe the demeanor of the witnesses and the parties, assess credibility, and weigh the evidence presented." *Jay H.*, 395 Ill. App. 3d at 1070.

¶ 49　　　　Here, the trial court's determination that it was in J.P.'s best interest to terminate respondent's parental rights was not against the manifest weight of the evidence. The evidence established that J.P. began living with Day in 2015, when she was two years old. An attachment existed between the two and Day was ensuring that all of J.P.'s medical, educational, and social needs were being satisfied. Day testified she was also working to address concerns regarding J.P.'s behavior and Hoffman testified J.P. was "making progress" in Day's home. Further, Day expressed that she would provide J.P. with permanency through adoption.

¶ 50　　　　Conversely, respondent had been in prison throughout the underlying proceedings and did not have a relationship with J.P. Day testified J.P. knew respondent's name and that he was her father. However, J.P. had not seen respondent since she was two years old. According to respondent, he was expected to remain in prison until at least 2021. Thus, the record reflects respondent was unable to care for J.P. at any point while the case was pending or for the foreseeable future.

¶ 51　　　　On appeal, respondent contends that termination is not in J.P.'s best interest because she was separated from I.B. and placement with I.B. was her "main source of stability." He further suggests that the children should be placed with Karmeletta, whom he asserts "is a good parent and could be a viable option for [both] children." First, the evidence shows that although J.P. and I.B. were no longer living in the same home, both children's foster parents—Day and Pates— acknowledged the importance of the sibling relationship and expressed a willingness to work with the other foster parent to facilitate that relationship. Second, as noted, the State also sought to terminate Karmeletta's parental rights in the underlying proceeding. Ultimately, the trial court

found her unfit and that termination of her parental rights was in the children's best interest. Accordingly, Karmeletta was not, and is not, a viable placement option for either child.

¶ 52 Ultimately, the record contains sufficient evidence to support the trial court's best-interest finding, and its decision was not against the manifest weight of the evidence.

¶ 53                                III. CONCLUSION

¶ 54 For the reasons stated, we affirm the trial court's judgment.

¶ 55 Affirmed.