2019 IL App (2d) 190485-U
No. 2-19-0485
Order filed November 1, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* A.H. and N.H., | ) | Appeal from the Circuit Court |
| Minors, | ) | of Winnebago County. |
| | ) | |
| | ) | Nos. 16-JA-33 |
| | ) | 16-JA-34 |
| | ) | |
| (People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee, v. Bianca H., | ) | Mary Linn Green, |
| Respondent-Appellant) | ) | Judge, Presiding. |

JUSTICE BURKE delivered the judgment of the court.
Justices Hutchinson and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's decision to terminate the parental rights of mother was not against the manifest weight of the evidence.

¶ 2    Respondent, Bianca H., appeals from the trial court's order terminating her parental rights to her two minor children, N.H. and A.H.  The trial court found respondent unfit for (1) failing to maintain a reasonable degree of interest, concern or responsibility as to the children's welfare (see 750 ILCS 50/1(D)(b) (West 2018)); (2) failing to make reasonable efforts to correct the conditions that were the basis for the removal of the children from the parent during any 9-month period following the adjudication of neglect (see 750 ILCS 50/1(D)(m)(i) (West 2018)); (3) failing to

make reasonable progress toward the return of the children during any 9-month period following the adjudication of neglect (see 750 ILCS 50/1(D)(m)(ii) (West 2018)); and (4) failing to protect the children from conditions within the environment injurious to the children's welfare (see 750 ILCS 50/1(D)(g) (West 2018)).  The court also determined that terminating respondent's parental rights was in the children's best interests.  We affirm.

¶ 3                                   I. BACKGROUND

¶ 4      N.H. was born on March 6, 2008, and her brother, A.H., was born on June 8, 2009.  DCFS first took protective custody of N.H. on April 28, 2009, when she was about seven weeks old. N.H. was placed in foster care because no suitable relative could be found to take her.  For several months, N.H. and A.H. were in and out of foster care due to inadequate supervision, including allowing a registered sex offender to supervise the children, and respondent's use of cocaine, heroin, and marijuana.

¶ 5      On July 2, 2010, custody of the children was granted to their father, Jesse H., with a court order prohibiting respondent's contact with the children.  Respondent was not reunified with the children because she failed to complete the required services.  On January 3, 2011, the case was closed, and full custody was granted to Jesse.

¶ 6      On January 8, 2015, respondent was convicted of prostitution and a false report to public safety.  Then, on October 26, 2015, respondent was convicted of resisting or obstructing a peace officer and a violation of the Hypodermic Syringes and Needles Act (720 ILCS 635/1 (West 2014)).

¶ 7      The State initiated new neglect proceedings when, on January 13, 2016, Jesse was home with the children and was arrested for possession of a firearm by a felon, possession of firearm without a valid FOID card, and possession of cannabis and other drugs.  According to a DCFS

child protection investigator, Jesse was in his bedroom with his paramour, Rose, and the children. The children were dressed appropriately, well behaved, and did not have any visible injuries. However, a loaded .38 caliber handgun was found in the top dresser drawer in the bedroom. The dresser did not have a lock and the drawer was open with the gun in plain sight, but it was likely out of the children's reach. The police confiscated 38 grams of cannabis and $1938 from the bedroom, plus 17 pills of oxytocin from a car running in the driveway.

¶ 8    Jesse, who was subsequently incarcerated in the Winnebago County jail, admitted to the investigator that the children were home when he was arrested. He contacted respondent, who took the children to his parent's home in Indiana. Respondent and Jesse then agreed to placing the children with Juanita Alfaro, N.H.'s prior foster parent.

¶ 9    On April 15, 2016, with respondent waiving her right to be present, the trial court adjudicated the children neglected. On May 25, 2016, respondent was found to be unfit or unable to care for, protect, train, or discipline the children; and the children were made wards of the court. DCFS was awarded guardianship, with the right to place them with a responsible relative or in traditional foster care.

¶ 10    An integrated assessment completed in June 2016 showed that respondent's self-reporting of substance abuse and mental health did not match her documented history. Respondent claimed to be sober and not in need of any therapy at that time. Respondent's service plan to work toward reunification with the children required completion of substance abuse services; individual psychotherapy; a psychiatric evaluation regarding her need for medications; random drug screens; parenting education and activities; and consultation with a domestic violence specialist. Respondent was also required to engage in consistent and predictable supervised visitations with the children.

¶ 11    Beginning in June 2016, the trial court evaluated respondent in six-month increments for her compliance with the required services.  The services requirements were clear, but respondent failed to complete them.

¶ 12    In June 2016, respondent was rated unsatisfactory because she was not compliant with her required services and had failed to maintain contact with her caseworker.  Respondent had failed to provide her caseworker with any contact information and did not sign releases.  Respondent also was not consistent in visiting the children and would often go weeks without seeing them.

¶ 13    In January 2017, respondent was rated unsatisfactory again because she barely maintained contact with her caseworker; and when she did make contact, she was confrontational and argumentative.  During the previous six months, respondent did not provide her caseworker with her contact information, did not appear for a required urine screen, and was unsuccessfully discharged from Rosecrance substance abuse services after attending two sessions and missing four.  Moreover, respondent had participated only in a few visits with the children since the inception of the case in January 2016.

¶ 14    In July 2017, respondent was rated unsatisfactory because she continued to maintain little contact with her caseworker, visited with the minors very infrequently, was charged with driving under the influence of alcohol (DUI) in February, refused to provide contact information, refused to engage in the recommended substance abuse services, and failed to provide proof that she was attending Remedies behavioral services, as she reported.  The caseworker could not refer respondent for the required urine screens because respondent did not maintain consistent contact or provide contact information.

¶ 15    Respondent's DUI charge in February 2017 stemmed from a collision with a semi-truck and a building.  Respondent was taken to a hospital, and alcohol was discovered in her vehicle and

in her pocket. Respondent smelled strongly of alcohol, slurred her speech, stumbled, and had glassy and bloodshot eyes. Respondent denied that she was in an accident and was generally uncooperative when interviewed by the police officers. Later she claimed to have been a passenger in the vehicle. Respondent exhibited bruises on her left collarbone area, which were consistent with injuries from a driver's seatbelt in a collision. Respondent refused to complete a preliminary breath test or field sobriety tests.

¶ 16    In December 2017, respondent was rated unsatisfactory because she still had not complied with substance abuse services. She overdosed on heroin twice in one weekend, tested positive for heroin, failed to maintain consistent contact with her caseworker, and failed to visit the children consistently.

¶ 17    In June 2018, respondent was rated unsatisfactory again. She appeared unstable and intoxicated at a DCFS team meeting in April and at two visits with the children in May 2018. She could not maintain her balance, slurred her words, acted jittery, had glassy and bloodshot eyes, and exposed a nipple when her shirt came down. Respondent claimed to caseworkers that she had been prescribed multiple muscle relaxers but did not provide proof of the prescriptions. DCFS and the caseworkers decided to suspend respondent's visitation until she attended a family case meeting and addressed her substance abuse. Respondent failed to attend the meeting and did not reschedule it. Respondent also did not appear for two requested urine screens and failed to provide proof of employment or housing during that review period. During that period, respondent was also discharged from her Remedies treatment program. She was participating in Foundations treatment for her DUI charges; however, she was advised that Foundations only covered alcohol abuse issues and did not address her drug abuse as she was required to do.

¶ 18    In July 2018, respondent's caseworker was advised that respondent had been arrested again for DUI. Visitation was never reinstated after respondent's supervised visitations were suspended in May 2018 because respondent failed to do what was required for reinstatement.

¶ 19    On October 4, 2018, the State filed a motion for termination of respondent's parental rights based on the preceding evidence. Following a hearing on June 5, 2019, the trial court found respondent unfit for (1) failing to maintain a reasonable degree of interest, concern or responsibility as to the children's welfare (see 750 ILCS 50/1(D)(b) (West 2018)); (2) failing to make reasonable efforts to correct the conditions that were the basis for the removal of the children from the parent during any 9-month period following the adjudication of neglect (see 750 ILCS 50/1(D)(m)(i) (West 2018)); (3) failing to make reasonable progress toward the return of the children during any 9-month period following the adjudication of neglect (see 750 ILCS 50/1(D)(m)(ii) (West 2018)); and (4) failing to protect the children from conditions within the environment injurious to the children's welfare (see 750 ILCS 50/1(D)(g) (West 2018)).

¶ 20    Immediately after finding respondent unfit, the trial court heard evidence relevant to the children's best interests. N.H. and A.H. had resided mostly together in foster homes as a "family unit," but at the time of the best interest hearing on June 5, 2019, they were placed separately due to A.H.'s behavioral problems and N.H.'s desire to remain in her school until the end of the academic year.

¶ 21    Zachary Chadwick, a Children's Home and Aid caseworker, testified at the hearing that he had been assigned to A.H. since April 2018. A.H. was placed in specialized foster care that provided behavioral counseling for his aggressive outbursts, which were diagnosed as ADHD and intermittent explosive disorder. A.H. had been previously hospitalized and was hospitalized at the time of the hearing, as his condition had worsened over the past three months. Chadwick testified

that neither respondent nor A.H.'s father could provide A.H. safety, security, food, clothing, or shelter.

¶ 22    Chadwick described two potential placements for the children: a previous foster parent, Juanita Alfaro, or the children's paternal aunt and uncle in Laporte, Indiana. The children could be placed with their aunt and uncle if DCFS and the corresponding agency in Indiana approved an interstate compact for placement outside Illinois. The aunt and uncle knew the children their whole lives and had visited them in Illinois. They expressed a willingness to provide permanency through adoption.

¶ 23    DCFS classified Juanita as "fictive kin," which meant that she has such a close emotional bond with the children that she is considered a relative, despite the lack of a biological relationship. Chadwick reported that A.H. repeatedly stated a preference for a placement with Juanita. In fact, he had punched and thrown objects at other foster parents because he wished to relocate to Juanita's home.

¶ 24    Juanita told the caseworker that her long-term preference for the children was a placement with the aunt and uncle, but if the interstate compact was not approved, she would move into a larger home and provide permanency for both children through adoption. Chadwick testified that, if neither placement was available, Children's Home and Aid would seek out a match in their list of foster parents or ask DCFS to get involved and help find an appropriate placement.

¶ 25    A.H. visited Jesse in jail for 30 minutes each week. He viewed Jesse as his dad and wished to spend more time with him, which was not possible due to Jesse's incarceration. Jesse was very important to A.H. If A.H. were placed with his aunt and uncle or Juanita, they would facilitate an ongoing relationship between A.H. and Jesse. A.H. had eight placements, including the hospital, in the prior six months, and Chadwick expressed sadness that he could not provide more stability.

Chadwick recommended changing the goal from substitute care to adoption because permanency was in AH.'s best interest.

¶ 26    Chadwick was aware that respondent was involved with Children's Home and Aid, and visitation was suspended in May 2018 because her mental health and drug use were worsening. Chadwick testified A.H. had been stabilized and was ready to leave the hospital. Children's Home and Aid would attempt placing him with Juanita, who was willing to care for him, but his condition made placement difficult. Juanita was preparing by coordinating with intensive placement stabilization services.

¶ 27    Madalyn Leber, also a Children's Home and Aid caseworker, testified that she was assigned to N.H. in May 2018. N.H. had been in three different schools and several placements during the school year. At the time of the hearing, N.H. was living apart from A.H., but Leber expected the siblings to be reunited either in the home of their aunt and uncle or with Juanita.

¶ 28    Like A.H., N.H. was having weekly visitation with Jesse, but his incarceration prevented him from providing for her welfare. Leber reported that N.H. had a good relationship with Jesse, but she could not comment on her relationship with respondent. No one had explained to N.H. why visitation with respondent was suspended in May 2018, but she told her foster parent that she thought respondent was on drugs. After visitation was suspended, N.H. did not ask about respondent, but the two saw each other at the funeral of N.H.'s maternal grandmother. Leber asked N.H. how respondent was doing, and N.H. responded, "fine" but did not say anything else.

¶ 29    Leber reported that N.H. needed special crisis intervention counseling. Respondent had many services to complete, and Leber believed that respondent could not comply with her service plans soon. Leber opined that making N.H. available for adoption was in her best interests because it would provide permanence and stability.

¶ 30    When Leber first discussed the possibility of N.H. not returning to her parents, she became anxious, worried, and upset, which triggered A.H.'s disruptive behavior. N.H. was particularly close to her father. Leber recommended that N.H. be allowed to maintain a relationship with Jesse, if possible, after adoption. Leber also insisted that she would work toward biweekly visitation with a three-year-old half-sibling of the children.

¶ 31    Respondent's counsel argued that, because no final placement plan had been established, terminating respondent's rights would create more instability, not less, in the children's already chaotic lives. However, the trial court found that it was in the children's best interests to terminate respondent's parental rights. The court commented on the children as follows:

> "In a perfect world, we'd have perfect solutions to everything. But one thing I do know is the parents are simply not in a position to parent these children right now, and with the horrible history that they have had being pulled from pillar to post, again, my responsibility as the judge in this courtroom is to do what's in the children's best interests. And I cannot think that it's in their best interests to have an open-ended future where they never know where they're going to be, that they never know when are Mom and Dad ever going to be able to come home? I don't know. You can't do that to children. They deserve better than that.
>
> [A.H.] needs special things that need to be given to him to let him be the person that he deserves to be. And it seems to me that [N.H.'s] doing remarkably well, considering the circumstances she's gone through. So as I tell parents from the minute they walk into this courtroom, I'm here to do what's in your children's best interests, and I think it's in their best interests that your parental rights be terminated."

¶ 32    Respondent filed a timely notice of appeal the day after the termination order was entered.

¶ 33                              II. ANALYSIS

¶ 34                              A. Unfitness

¶ 35    Respondent appeals from the termination of her parental rights.  A parent's right to raise his or her biological child is a fundamental liberty interest, and the involuntary termination of that right is a drastic measure.  *In re Haley D*., 2011 IL 110886, ¶ 90.  Accordingly, the Juvenile Court Act of 1987 (Juvenile Court Act) provides a two-stage process for the involuntary termination of parental rights.  705 ILCS 405/2-29(2) (West 2018).  Initially, the petitioner must prove by clear and convincing evidence that the parent is unfit.  705 ILCS 405/2-29(2), (4) (West 2018); 750 ILCS 50/1(D) (West 2018); *In re Adoption of Syck*, 138 Ill. 2d 255, 277 (1990); *In re Antwan L*., 368 Ill. App. 3d 1119, 1123 (2006).  We will reverse the trial court's finding of unfitness only if it is against the manifest weight of the evidence.  A determination of unfitness is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or the determination is unreasonable, arbitrary, or not based on the evidence presented.  *In re Addison R*., 2013 IL App (2d) 121318, ¶ 22.

¶ 36    Section 1(D) of the Adoption Act sets forth numerous grounds under which a parent may be found unfit, but any one of the grounds, if properly proven, is sufficient to enter a finding of unfitness.  *In re Joshua S*., 2012 IL App (2d) 120197, ¶ 44.  The trial court is generally in the best position to assess the credibility of the witnesses and, therefore, we will not reweigh or reassess credibility on appeal.  As cases concerning parental unfitness are *sui generis*, unique unto themselves, courts generally do not make factual comparisons to other cases.  *Joshua S*., 2012 IL App (2d) 120197, ¶ 44.

¶ 37    In this case, the trial court found respondent unfit on multiple grounds, but we need address only respondent's lack of progress toward the return of the children to her during a relevant nine-

month period, because it supports the finding of unfitness. See 750 ILCS 50/1(D)(m)(ii) (West 2016); *Joshua S.*, 2012 IL App (2d) 120197, ¶ 44. Under an objective standard, reasonable progress requires, at a minimum, the parent make measurable steps toward the goal of reunification through compliance with court directives, service plans, or both. *In re J.A.*, 316 Ill. App. 3d 553, 564-65 (2000). The trial court must consider evidence occurring only during the relevant nine-month period mandated in section 1(D)(m) in determining whether a parent has made reasonable progress toward the return of the children. *In re J.L.*, 236 Ill. 2d 329, 341 (2010).

¶ 38 The trial court found that respondent failed to make reasonable progress toward the return of the children, citing three nine-month periods: (1) April 15, 2016, to January 15, 2017, (2) January 15, 2017, to October 15, 2017, and (3) October 15, 2017 to July, 15, 2018. We conclude that the evidence supports the court's finding that she failed to make reasonable progress toward the return of the children during the final nine-month period, from October 15, 2017 to July 15, 2018.

¶ 39 Respondent was assessed for services and was provided service plans. A service plan is an integral part of the statutory scheme for measuring progress toward the goal of reunification of the parent and the child. *In re C.N.*, 196 Ill. 2d 181, 215 (2001); *Nevaeh R.*, 2017 IL App (2d) 170229 ¶ 23. To work toward reunification with the children, she was required to complete substance abuse services; individual psychotherapy; a psychiatric evaluation regarding her need for medications; random drug screens; parenting education and activities; and consultation with a domestic violence specialist. Respondent was also required to engage in consistent and predictable supervised visitation.

¶ 40 Respondent was rated unsatisfactory from July 2017 through June 2018 for not making reasonable progress toward completion of her services. During that period, she failed to complete

substance abuse treatment and overdosed on heroin twice in one weekend. She also failed to maintain consistent contact with her caseworker or visit the children consistently. She appeared unstable and intoxicated at a DCFS team meeting in April 2018 and at two visits with the children in May 2018. Respondent could not credibly explain her intoxicated condition to the caseworkers, who suspended visitation. Respondent was told that visitation would be reinstated if she attended a family case meeting and addressed her substance abuse, but she failed to do so. Respondent pursued alcohol abuse treatment, but the caseworkers explained to her that those services did not address her drug abuse as required.

¶ 41    Moreover, in July 2018, respondent's caseworker was advised that she had been arrested again for DUI. Visitation was never reinstated after respondent's supervised visitations were suspended in May 2018 because respondent failed to do what was required for reinstatement.

¶ 42    Respondent argues that she showed "some minimum movement toward the return of the children" in that she attended classes for her DUI, obtained housing and intermittent employment, and claimed to be undergoing substance abuse treatment, which she claims qualify as reasonable progress under the circumstances. However, respondent never progressed beyond unsupervised visitation with the children, and in fact, her visitation was suspended when her mental health and drug abuse worsened. Respondent was no closer to their return home at the time of the unfitness hearing than she was when they were adjudicated neglected.

¶ 43    Under an objective standard, respondent did not make measurable steps toward the goal of reunification through compliance with the court directives and the service plans. We agree with the State that the trial court's finding of unfitness for failure to make reasonable progress toward reunification with the children for at least one relevant nine-month period is not against the manifest weight of the evidence. We cannot say that the opposite conclusion is clearly evident or

the court's determination is unreasonable, arbitrary, or not based on the evidence presented. See *Addison R.*, 2013 IL App (2d) 121318, ¶ 22.

¶ 44                                    B. Best Interests

¶ 45    If the court finds the parent unfit, the petitioner must then show that termination of parental rights would serve the child's best interests. 705 ILCS 405/2-29(2) (West 2018); *Syck*, 138 Ill. 2d at 277; *Antwan L.*, 368 Ill. App. 3d at 1123. As our supreme court has noted, at the best-interests phase, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004).

¶ 46    Section 1-3 of the Juvenile Court Act enumerates factors that must be considered when determining whether termination of parental rights is in the minor's best interest, including (1) the physical safety and welfare of the child, (2) the development of the child's identity, (3) the child's background and ties, (4) the child's sense of attachments, (5) the child's wishes, (6) the child's community ties, (7) the child's need for permanence, (8) the uniqueness of every family and child, (9) the risks attendant to entering and being in substitute care, and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2018). "Additionally, the court may consider the nature and length of the child's relationship with her present caretaker and the effect that a change in placement would have upon her emotional and psychological well-being." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. "The [juvenile] court's best interest determination need not contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the [juvenile] court below in affirming its decision. *Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 47    The State bears the burden of proving by a preponderance of the evidence that termination is in the best interests of the minor. *D.T.*, 212 Ill. 2d at 366. A lower court's determination that

the State has met its burden will not be reversed unless it was against the manifest weight of the evidence (*In re Austin W.*, 214 Ill. 2d 31, 51-52 (2005)), which occurs only if an opposite conclusion is clearly apparent (*In re B'yata I.*, 2015 IL App (2d) 130558, ¶ 41).

¶ 48     Respondent argues that termination of her parental rights was not in the children's best interests because "[t]he children were clearly bonded to their father and severing [respondent's] rights to her children would most likely result in those rights being severed as well." Despite the children's bond with their father, the caseworkers believed it was important to provide stability through freeing up the children for adoption. We acknowledge that the children had an attachment to their father, but the court heard evidence that they were less attached to respondent. The court emphasized the children's need for stability and permanence. Both parents were incarcerated, and neither could improve the conditions resulting in the children's removal, despite being afforded more than two years to do so. Respondent's unfitness prevented the children from returning to her, as she cannot provide permanency or stability

¶ 49     The children's placement had not yet been finalized at the time of the best interests determination, but two viable options were presented to the trial court. The caseworkers' plan was to place the children with their paternal aunt and uncle, whom they had known their whole lives and who offered to adopt them, assuming an interstate compact between DCFS and Indiana was approved. If approval was denied, Juanita, who was deemed fictive kin by DCFS, was prepared to move to a larger home, and adopt the minors. At the time of the best interest hearing, the children were preparing to move in with Juanita: A.H. was awaiting discharge from the hospital and N.H. was finishing the school year at her prior placement. Both Juanita and the children's aunt and uncle offered permanency through adoption, and they indicated a willingness to support the children's relationship with their father, if appropriate.

¶ 50    Neither respondent nor the children's father could provide for the children's needs for shelter, food, clothing, health care, counseling, education, or safety.  A.H. was hospitalized and underwent counseling for significant psychiatric needs that respondent could not meet.  Although the children had bonded with the father, he was incarcerated throughout the entire case, and respondent's supervised visitation with them was limited and sporadic at best.

¶ 51    We conclude that respondent has not established that the trial court's best-interests finding is against the manifest weight of the evidence.  The children need permanency after multiple placements over several years.  DCFS attempted to stabilize the children's placements, but by the time of the best interest hearing in June 2019, they had each been placed many times with several different caregivers.  The trial court could have reasonably concluded that the stability and permanency that an adoption would provide were preferable to the uncertainty resulting from a guardianship during respondent's incarceration.  The trial court heard ample evidence that respondent failed to complete any of the services that were proposed to help her reunify with the children.  Moreover, in November 2018, respondent was charged with aggravated DUI and convicted of the offense in May 2019, which further delayed any possible reunification.

¶ 52    Based on the evidence, the trial court found that it was in the children's best interests to terminate respondent's parental rights and to grant DCFS the power to consent to their adoptions.  One could argue that termination of respondent's parental rights should be delayed until one of the two placements is definitively selected as the adoptive home.  However, the court's best interest determination is not against the manifest weight of the evidence in that the opposite conclusion is not clearly apparent.

¶ 53                                          III. CONCLUSION

¶ 54    For the reasons stated, the order terminating respondent's parental rights to N.H. and A.H.

is affirmed.

¶ 55    Affirmed.