NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 230539-U

NOS. 4-23-0539, 4-23-0540 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 3, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* P.M., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | McDonough County |
| Petitioner-Appellee, | ) | No. 17JA15 |
| v. | ) | |
| Joshua M. and Stephanie S., | ) | Honorable |
| Respondents-Appellants). | ) | Heidi A. Benson, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE DeARMOND delivered the judgment of the court.
Justices Zenoff and Doherty concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, finding (1) the trial court did not err by using a
            subjective standard to find the parents unfit and (2) the best interest determination
            was not against the manifest weight of the evidence.

¶ 2        In August 2022, the State filed a petition for termination of parental rights as to

Stephanie S. and Joshua M., the parents of P.M. (born May 2017). In May 2023, the trial court

granted the petition and terminated respondents' parental rights.

¶ 3        On appeal, the parents allege (1) the trial court erred by using a subjective rather

than objective standard when finding the parents unfit and (2) the best interest determination was

against the manifest weight of the evidence. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5        In June 2017, the State filed a petition for adjudication of wardship for P.M., who

was 10 days old at the time, alleging medical personnel "expressed concerns about whether

Respondent Parents could adequately care for the minor" due to suspected cognitive delays. Specifically, the parents required "extensive teaching" on how to care for an infant and the parents reported they gave P.M. water to drink after being told to give P.M. exclusively formula. The petition also alleged Mother had been previously convicted of involuntary manslaughter in the death of a child, which Father was aware of. The trial court found P.M. neglected and made P.M. a ward of the court.

¶ 6 In July 2018, the State filed a petition to terminate parental rights. The petition alleged the parents (1) failed to make reasonable progress during the nine-month period of October 3, 2017, to July 3, 2018 (750 ILCS 50/1(D)(m)(ii) (West 2018)) and (2) were unable to discharge parental responsibilities due to a mental impairment, mental illness, or mental retardation and their inability to discharge parental responsibilities would extend beyond a reasonable period of time (750 ILCS 50/1(D)(p) (West 2018)). The trial court terminated the parents' rights. On appeal, the Third District reversed. See *In re P.M.*, 2019 IL App (3d) 190112-U.

¶ 7 In January 2020, the trial court reset the goal to return home within 12 months, directed the Illinois Department of Children and Family Services to reinitiate services, and ordered the parents to undergo new psychological evaluations and parenting capacity assessments. Due to the COVID-19 pandemic, the evaluations had to be rescheduled numerous times.

¶ 8 Father's psychological evaluation report was completed in August 2020. Father's full scale IQ score was 69, falling in the "mild mental intellectual disability" range. The examiner stated Father was "likely to need minimal, but regular assistance to help provide proper and safe parenting to his daughter."

¶ 9        Father's parenting capacity assessment was completed in May 2021. Father demonstrated "adequacy" in the categories of engagement and nurturance. The examiner observed Father "enjoyed taking part in play with [P.M.] and [P.M.] appeared to enjoy the time and attention that she received from her father." Father's weaknesses were in the categories of structure and challenge. The examiner expressed, "[Father] may struggle in his ability to provide an adequate level of structure, behavior modification, and challenge for [P.M.] in daily life" and "[Father's] intellectual disabilities may limit his ability to parent in these areas."

¶ 10        Mother's psychological evaluation was completed in August 2021. Mother's full scale IQ score was 59, in the "Extremely Low" range in comparison to others her age. On a parenting relationship questionnaire, Mother scored "Significantly Below Average" on attachment and indicated "having problems predicting and understanding her child's emotions, and *** providing comfort when [P.M.] is upset." The examiner diagnosed Mother with a moderate intellectual disability and paranoid personality disorder. The report found Mother's "cognitive and adaptive deficits [were] likely to have a significant impact on her ability to function independently and as a parent."

¶ 11        Mother's parenting capacity assessment was also complete in May 2021. Mother demonstrated "adequacy" in nurturance and engagement and "weakness" in structure and challenge. Mother was "warm and affectionate, and able to remain engaged and interested in her daughter's feelings and activities." However, Mother had difficulty in "her ability to manage her daughter's behavior or in helping her daughter to remain engaged in activities that were not of interest to her." The examiner reported, after completing the interview, "this examiner said goodbye to her, talked to her about how to exit the building, asked about where her car was parked, and yet it became clear to this examiner that [Mother] had some confusion regarding

whether the test was over or not." The examiner expressed Mother "may be limited in her ability to understand directions and fully comprehend some situations due to her intellectual disability." The examiner also noted, "[Mother] did not appear to have a healthy understanding of her limitations due to her disability."

¶ 12     In August 2022, the State filed a new petition to terminate parental rights. The petition alleged the parents were both unfit due to "an inability to discharge parental responsibilities due to a mental impairment, mental illness or mental retardation *** and said inability to discharge parental responsibilities shall extend beyond a reasonable period of time." See 750 ILCS 50/1(D)(p) (West 2022).

¶ 13                    A. Fitness Hearing

¶ 14     The fitness hearing portion of the termination proceedings was held over two days on February 16, 2023, and April 27, 2023.

¶ 15     Dr. Quynh Gaio Kim Nguyen testified she is a pediatrician and coauthored a comprehensive report on P.M. Dr. Nguyen reported P.M. was diagnosed with Rett syndrome, a neurodevelopmental disorder "characterized by the child having kind of normal development for a period of time and then regressing, meaning losing those learned skills or motor activity." P.M. also had a provisional autism spectrum disorder diagnosis. Dr. Nguyen stated, to mitigate the progression of P.M.'s condition, "[t]here's never going to be a time when she's not going to have therapy," and caretakers would need to monitor her for subtle changes and be "vigilant" on follow-ups with her primary care physician and specialists.

¶ 16     Dr. Stephanie Kohlman testified she is a clinical psychologist at Children's Research Triangle. Dr. Kohlman coauthored the comprehensive report on P.M. with Dr. Nguyen after completing numerous assessments with P.M. Dr. Kohlman reported P.M. scored low on a

"health and safety" portion of one of the assessments, which demonstrated P.M. "can respond and react impulsively, so she might act before considering the consequences of her actions." Dr. Kohlman opined P.M.'s caretakers would require extra vigilance. P.M. also scored low in "self-care activities" and would require extra assistance with taking care of herself. Another assessment indicated to Dr. Kohlman that caregivers would need to provide P.M. "more support and structure" around daily living tasks such as dressing, bathing, feeding herself, and cleaning up. Dr. Kohlman expressed a concern P.M. had symptoms consistent with attention-deficit/hyperactivity disorder.

¶ 17 Jonna Tyler testified she conducted the parenting capacity assessments for Mother. Tyler found Mother "kind and cooperative" but "lack[ing] insight significantly regarding her own limitations." Mother was adequate in engagement and nurturance and weak in structure and challenge. Tyler had concerns about Mother's ability to provide the level of care P.M. required due to her medical conditions. Mother's weaknesses were in "the nuts and bolts of the unenjoyable things, which would include some caregiving things, *** going to bed when you don't want to, going to therapy when you don't want to, all of that kind of stuff." Tyler also raised concerns with Mother being unaware the test was over after Tyler said goodbye and directed her out of the building. When asked if any services or interventions could "get [Mother] to a level where she could adequately manage and ensure that [P.M.'s] special needs are met," Tyler responded:

> "The kind of disability that I saw is not the kind of disability that you can
> get a parenting coach to change that, if you know what I mean. It wasn't just a
> matter of getting more parent coaching to learn how to manage her behavior. It

was more than that. It was the ability to follow directions, which is not something that you can change through a coach or through a lesson or an extra service."

¶ 18 Tyler also testified as to Father's parenting capacity assessment. Father was also adequate in the categories of nurturance and engagement, and the challenge and structure categories were his weaknesses. Father was not able to direct P.M.'s attention or keep her engaged in activities that she did not find fun or interesting. Tyler expressed, after observing both parents with P.M., neither would be able to safely parent P.M. without a supervisor.

¶ 19 On cross-examination, Tyler explained a lot of the referrals she gets for parenting capacity assessments are for parents with intellectual impairments. Tyler also confirmed she has performed a "significant number" of parenting capacity assessments for children with special needs, although she did not recall ever having a child with Rett syndrome. Tyler provided accommodations as needed for the parents and P.M. She acknowledged Mother helped P.M. eat a snack, watched to see if P.M. was eating appropriately, and intervened as necessary. Tyler acknowledged the relatively short period of time spent observing the child and parent in question.

¶ 20 Dr. Rudolf Breitmeyer was a clinical psychologist who conducted a psychological evaluation on Father. Father was cooperative during the interview. Dr. Breitmeyer conducted standardized tests with Father, including a personality test, cognitive test, and assessment of academic function. Father tested into the upper end of the "extremely low/impaired range" with a full-scale IQ of 69. Father was "somewhat defensive" during the personality test, which was "not uncommon" for parents wanting to "put their best foot forward." This caused some of the tests to have "limited utility" and "questionable validity." Overall, Dr. Breitmeyer felt Father's intellectual issues affected his ability to care for a child, but his "fairly strong academic reading

skills" were mitigating. "He's functionally literate. That means he can administer—for example, he can administer medication, he can cook a simple meal from a recipe, stuff like that." Dr. Breitmeyer confirmed he had no knowledge of P.M. and her special needs.

¶ 21    Dr. Daniel Ebbert testified he conducted Mother's psychological evaluation. Dr. Ebbert requested the caseworker, Randall Aldridge, complete a questionnaire for Mother's assessment, but he never received a completed response. Dr. Ebbert noted Mother had a "significant delay" when responding to his questions and, when asked to spell P.M.'s name, Mother provided a different spelling than the paperwork, despite having a tattoo of P.M.'s name on her arm. For parts of the assessment, Dr. Ebbert provided an accommodation for Mother, having a reader read the assessment questions out loud to Mother. Mother reported she had been in special education classes since the first grade. Mother had an overall IQ of 59, which is in the extremely low range. Dr. Ebbert explained, in the four subsections, Mother would have difficulty with language-based tasks, understanding even visual directions, short-term working memory, and multistep directions, and thinking through information quickly, even on simple tasks. Mother's reading, math, and spelling skills were all around the third-grade level. Dr. Ebbert identified paranoid personality disorder, and he noted she was "self-critical, uncertain, and indecisive" in stressful situations where decisions needed to be made quickly. Mother scored "significantly below average" on a scale involving the "ability to kind of provide comfort, predict what a child might need, understand your child's emotions and *** help your child understand their emotions and deal with those effectively." Mother also scored significantly below average on the "relational frustration scale," which indicates "she believes that [P.M.], her daughter, is not hard to care for, that she has a fairly easy time dealing with her." When both scales are significantly below average, Dr. Ebbert opined it can demonstrate a "lack of awareness

sometimes of what goes into the parenting realm." In Dr. Ebbert's opinion, Mother would have difficulty successfully navigating the day-to-day parenting of an "average" child, and those issues would only be worse with a child with special needs. On cross-examination, Dr. Ebbert explained Mother could potentially learn some skills to improve her parenting, but those skills would be "difficult" for her to learn, even with special coaching. Mother had not listed skills she's learned through multiple rounds of parenting and therapy when Dr. Ebbert was assessing her.

¶ 22 The State called the foster mother, Susan E., as a witness, and Father's attorney objected on relevancy. Father's attorney argued the fitness portion focused on the parents under an objective standard and had "absolutely nothing to do yet with the child." The trial court ruled:

> "Well, I believe that this is a matter of first impression and that is whether inability to discharge parental responsibilities due to cognitive disability or mental impairment is a subjective or an objective test. ***

> I'm not aware of any case authority on this, but the Court believes that the correct standard would be subjective, meaning that we are taking into account the abilities, medical condition and care necessary to maintain the child that we are in the hearing of when we are determining what parental responsibilities we are litigating. And the Court would acknowledge that that will be slightly different for every child, but the Court believes that is the appropriate juvenile court standard is to determine whether the biological parents are fit to take care of the particular child that we have in care."

¶ 23 Susan E. testified P.M. resides with her, her husband, and their 15-year-old son. P.M. receives physical therapy, occupational therapy, and speech therapy. When P.M. was

diagnosed with Rett syndrome, they drove to Texas Children's Hospital to see a Rett syndrome specialist. They needed to watch P.M. closely for any regression or loss of function, and the specialist recommended physical activity. P.M. participates in dance and swimming. P.M. is rarely left alone, as she needs special observation when completing common activities like taking a bath or feeding herself.

¶ 24    The trial court found both parents had a mental impairment, "and as a result, they are neither one able to discharge parental responsibilities for this child through no lack of effort or love or desire on their part which, to echo the guardian *ad litem*, is heartbreaking." The court continued:

> "I've touched on this, but I have something in my notes from Dr. Nguyen that I think is—really speaks to this case. She was describing that the parents for [P.M.], or parent, need to be in tune with [P.M.] even to things that are subtle. They need to be able to follow up with physicians. They need to have knowledge, organization and they must have an ongoing ability to adapt and respond to [P.M.'s] needs as [P.M.'s] needs develop. The Court finds by clear and convincing evidence that that is not [Father] and [Mother]."

¶ 25    B. Best Interest Hearing

¶ 26    At the May 2023 best interest hearing, Alexis Roach testified she had been P.M.'s caseworker since October 2021. P.M. had been with the foster family since she was 9 or 10 days old. P.M. was well cared for by the foster family, and they were willing to provide permanency through adoption. The foster family followed the recommendations of medical providers and advocated for P.M.'s care. P.M. enjoyed swimming and dance classes, playing tee-ball, and playing with dolls. P.M. seeks comfort from her foster parents and calls them "mom" and "dad."

She is bonded with her foster parent's son. P.M. calls her biological parents "Mommy Stephanie" and "Daddy Josh." Roach had not spoken to P.M. about her desires because of her age. Roach believed Mother, Father, and P.M. all loved each other.

¶ 27　　　　The foster father, Bronson E., testified P.M. had been living with them for almost six years. P.M. has about one or two doctors' appointments per month, as well as therapies done though school. P.M. attends family gatherings with the foster parents' extended families. The foster parents are "learning constantly" to understand P.M.'s medical conditions.

¶ 28　　　　The trial court found it was in the best interest of P.M. to terminate the parents' parental rights.

¶ 29　　　　This appeal followed.

¶ 30　　　　　　　　　　　　　　II. ANALYSIS

¶ 31　　　　On appeal, the parents argue (1) the trial court incorrectly used a subjective rather than objective standard in determining unfitness and (2) the best interest finding was against the manifest weight of the evidence.

¶ 32　　　　The Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2022)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2022)) govern how the State may terminate parental rights. *In re D.F.*, 201 Ill. 2d 476, 494, 777 N.E.2d 930, 940 (2002). Together, the statutes outline two necessary steps the State must take before terminating a person's parental rights—the State must first show the parent is an "unfit person," and then the State must show terminating parental rights serves the best interest of the child. *D.F.*, 201 Ill. 2d at 494-95 (citing 750 ILCS 50/1(D) (West 1998); 705 ILCS 405/2-29(2) (West 1998)).

¶ 33　　　　　　　　　　　　　A. Unfitness

¶ 34    " 'The State must prove parental unfitness by clear and convincing evidence.' "

*In re A.L.*, 409 Ill. App. 3d 492, 500, 949 N.E.2d 1123, 1129 (2011) (quoting *In re Jordan V.*,

347 Ill. App. 3d 1057, 1067, 808 N.E.2d 596, 604 (2004)). The Adoption Act provides several

grounds on which a trial court may find a parent "unfit," including section 1(D)(p) which

provides as follows:

> "Inability to discharge parental responsibilities[,] supported by competent
> 
> evidence from a psychiatrist, licensed clinical social worker, or clinical
> 
> psychologist of mental impairment, mental illness[,] or an intellectual disability
> 
> *** and there is sufficient justification to believe that the inability to discharge
> 
> parental responsibilities shall extend beyond a reasonable time period." 750 ILCS
> 
> 50/1(D)(p) (West 2022).

In this case, the parents do not argue the court's determination of unfitness by mental impairment

was against the manifest weight of the evidence. See *In re Addison R.*, 2013 IL App (2d) 121318,

¶ 22, 989 N.E.2d 224 (stating this court will reverse the finding of parental unfitness only if it is

against the manifest weight of the evidence). Rather, the parents argue the "[i]nability to

discharge parental responsibilities" should be an objective standard, essentially whether the

parents can take care of the average child. Therefore, they argue the court incorrectly used a

subjective standard, taking into account the special needs of P.M. in determining whether the

parents could discharge parental responsibilities.

¶ 35    " '[T]he interest of parents in the care, custody, and control of their children—is

perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme

Court].' " *In re N.G.*, 2018 IL 121939, ¶ 25, 115 N.E.3d 102 (quoting *Troxel v. Granville*, 530

U.S. 57, 65 (2000)). This fundamental right is, however, for parents to parent *their* children, not

a right to parent children in general. Therefore, underlying the entirety of termination proceedings are the specific circumstances of the child in question.

¶ 36　　　　Section 20a of the Adoption Act supports this approach, stating: "The best interests and welfare *of the person to be adopted* shall be of paramount consideration in the construction and interpretation of this Act." (Emphasis added.) 750 ILCS 50/20a (West 2022). In reading section 1(D)(p), we must take into account the best interest of the child in question. Section 1(D)(p) requires the parents be unable to "discharge parental responsibilities." The Adoption Act does not discuss "normal" parental responsibilities or parental responsibilities for an "average" child, because the core question is whether the parents can discharge their parental responsibilities as to *their* child.

¶ 37　　　　In this case, P.M. is not a "average" child. P.M. has medical conditions which require special care and will continue to develop in their complexity. Dr. Nyugen testified Rett syndrome is a regressive condition, and P.M.'s caretakers would need to be vigilant in monitoring her for changes and keeping up with her condition. Dr. Kohlman testified P.M. would need additional help with basic activities such as eating and bathing.

¶ 38　　　　The trial court found both parents were unable to discharge the parental responsibilities as pertained to P.M. due to their mental impairment, and the parents do not argue on appeal that this determination was against the manifest weight of the evidence. Further, the evidence supports the court's conclusion. The State presented competent evidence from clinical psychologists and a licensed counselor as to the parents' limitations. Tyler testified both parents had weaknesses in the areas of challenge and structure and opined no amount of parenting classes could improve their parenting skills in these areas. Tyler testified neither parent could safely parent P.M. or meet her needs without a parenting coach present. Dr. Breitmeyer testified

Father's intellectual issues affected his ability to care for a child. Dr. Ebbert testified Mother would have difficulty caring for an average child and the difficulty would increase for a child with special needs. Neither doctor believed the parents could improve their ability to parent in a meaningful way. Tyler and Dr. Ebbert each provided accommodations as needed and possible for the parents and P.M. during their evaluations. (We note Dr. Breitmeyer was not asked about accommodations during his evaluation of Father.) The court's finding both parents were unfit by reason of mental impartment was not against the manifest weight of the evidence. See *Addison R.*, 2013 IL App (2d) 121318, ¶ 22 ("A determination of unfitness is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or the determination is unreasonable, arbitrary, or not based on the evidence presented.").

¶ 39                                B. Best Interest

¶ 40          After a parent is found unfit, "the focus shifts to the child." *In re D.T.*, 212 Ill. 2d 347, 364, 818 N.E.2d 1214, 1227 (2004). The issue ceases to be "whether parental rights *can* be terminated" and becomes "whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *D.T.*, 212 Ill. 2d at 364. The trial court will consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2022)). See *In re T.A.*, 359 Ill. App. 3d 953, 959-60, 835 N.E.2d 908, 912-13 (2005). Those factors include: the child's physical safety and welfare; the development of the child's identity; the child's familial, cultural, and religious background and ties; the child's sense of attachments, including where the child feels loved, attached, and valued; the child's sense of security, familiarity, and continuity of affection, and the least disruptive placement alternative for the child; the child's wishes and long-term goals; the child's community ties; the child's need for permanence; and the uniqueness of every family and each child. 705 ILCS 405/1-3(4.05) (West

2022). We will not overturn a court's best interest finding unless it is against the manifest weight of the evidence. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071, 918 N.E.2d 284, 291 (2009).

¶ 41　　　　　In this case, the evidence showed the best interest factors supported the termination of the parents' parental rights. P.M. had lived with her foster family since she was 10 days old. The foster family was well bonded with her, took care of her needs, and was well acquainted with her conditions. Bronson E. testified the family was "learning constantly" to better understand P.M.'s medical conditions and make sure she was provided with the best care. P.M. attended extended family gatherings with her foster family. Although it is clear there was mutual love between P.M. and her biological parents, it is also clear her parents could not provide the level of care needed for P.M.'s special needs. Further, this case had been ongoing for six years at the time of the best interest hearing, and P.M. had spent almost her entire life with her foster family. P.M. deserved permanence, which would be best found with her foster family, who were committed to her adoption.

¶ 42　　　　　Within the spectrum of cases seen by juvenile courts, cases such as this may be among the most disturbing for a variety of reasons. When parents abuse their children, or offer nothing in the way of positive parenting, or parenting at all, the decision to terminate their rights after failing to correct the conditions causing their children to come into care is probably not so difficult. When parents with developmental disabilities or mental impairment, who truly want to parent, but are unfortunately unable to do so through no fault of their own, the decision to terminate parental rights must be much harder. Here, the trial court had a substantial amount of evidence upon which to conclude these parents were unable, despite their love and concern for P.M., to ever be able to address the complex needs of their child. Having reached that decision, termination was in the best interest of P.M.

¶ 43 The trial court's best interest decision was not against the manifest weight of the evidence, as the opposite conclusion was not clearly evident. See *T.A.*, 359 Ill. App. 3d at 960.

¶ 44 III. CONCLUSION

¶ 45 For the reasons stated, we affirm the trial court's judgment.

¶ 46 Affirmed.