NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 251255-U

NO. 4-25-1255

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 26, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* K.D., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | McLean County |
| Petitioner-Appellee, | ) | No. 23JA42 |
| v. | ) | |
| Keatta D., | ) | Honorable |
| Respondent-Appellant). | ) | John B. Goldrick, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices DeArmond and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed the trial court's finding that respondent mother was unfit where the evidence presented at the fitness hearing established that respondent suffered from an intellectual disability that prevented her from discharging her parental responsibilities as to her child.

¶ 2        Respondent, Keatta D., is K.D.'s mother. The State filed a petition to terminate respondent's parental rights, alleging that respondent was unfit pursuant to section (1)(D)(p) of the Adoption Act (750 ILCS 50/1(D)(p) (West 2024)). Following a fitness hearing, the trial court entered an order finding respondent unfit. Following a best-interest hearing, the court found it was in K.D.'s best interest to terminate respondent's parental rights. Respondent appeals the court's finding of unfitness. For the reasons that follow, we affirm.

¶ 3                                I. BACKGROUND

¶ 4                          A. Adjudication of Wardship

¶ 5          In April 2023, the State filed a petition for adjudication of wardship, alleging that K.D., an infant, was residing in an environment injurious to her welfare because respondent had previously been found "fit but unable because she is cognitively unable to safely parent due to her intellectual disability" in a prior juvenile court case involving respondent's "prior born minors." 705 ILCS 405/2-3(1)(b) (West 2022). The petition alleged that this situation "create[d] a risk of harm to [K.D.]."

¶ 6          The same day, the trial court entered a temporary custody order, finding "probable cause for the filing of the petition" and "an immediate and urgent necessity to remove the minor from the home." The court granted temporary custody of K.D. to the Illinois Department of Children and Family Services (DCFS), with the right to place.

¶ 7          A hearing on the petition for adjudication of wardship was held in June 2023. At the hearing, respondent admitted to the allegation in the petition. The State then provided a factual basis, asserting that it could call witnesses who would testify that respondent had "prior juvenile court involvement" in a case in which respondent was found "fit but unable because she is cognitively unable to safely parent due to her intellectual disability." The State indicated that finding "was a result of an opinion from a professional in a parenting capacity assessment." The trial court entered an order finding K.D.'s environment injurious to her welfare based on the facts provided by the State and adjudicated K.D. "[n]eglected."

¶ 8                              B. Dispositional Hearing

¶ 9          In August 2023, a dispositional hearing was held. The trial court's written order provided that respondent was "unfit" and "unable" to "care for, protect, train, educate, supervise or discipline the minor(s) and placement with her is contrary to the health, safety and best interest of the minor(s) because she is unable to safely parent due to a Parenting Capacity Assessment"

completed in 2022. The order further provided: "She must demonstrate the ability to provide structure [and] guidance to the minor and demonstrate she can safely parent independently."

¶ 10                      C. Petition to Terminate Parental Rights

¶ 11         On March 28, 2025, the State filed a petition to terminate respondent's parental rights. The petition alleged that respondent was an unfit person because she (1) failed to make reasonable progress toward the return of K.D. to her during the nine-month period of April 7, 2024, through January 7, 2025, pursuant to section (1)(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2024)) and (2) is unable to discharge parental responsibilities, supported by competent evidence from a clinical psychologist of an intellectual disability, as defined in section 1-116 of the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/1-116 (West 2024)), and "there is sufficient justification to believe that the inability to discharge parental responsibilities shall extend beyond a reasonable time period," pursuant to section (1)(D)(p) of the Adoption Act (750 ILCS 50/1(D)(p) (West 2024)).

¶ 12                             D. Fitness Hearing

¶ 13         On October 16, 2025, the trial court held a fitness hearing. Three witnesses testified for the State.

¶ 14                             1. *Dr. Mary Gardner*

¶ 15         Dr. Mary Gardner, a licensed clinical psychologist, testified that she performed a psychological evaluation of respondent and provided her report to the trial court. That report, as well as Dr. Gardner's curriculum vitae (CV), were admitted into evidence without objection. The parties stipulated that Gardner is an expert in psychology, and the court accepted that stipulation.

¶ 16         Dr. Gardner testified that she evaluated respondent in person on August 8, 2025, for approximately three hours. After assessing respondent and having her perform various tests,

Dr. Gardner diagnosed respondent with a mild "intellectual disability or impairment" and "an adjustment disorder with depressed mood." Both diagnoses are contained in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5), which Dr. Gardner testified "is the handbook and the manual that all mental health professionals use to provide a diagnostic disorder along with the code of the disorder." According to the DSM-5, a diagnosis of an "intellectual disability" consists of three components: (1) an IQ score that is typically below 70; (2) poor "adaptive functioning," which is a measurement of one's ability "to engage in life skills in various domains—social, communication, functional, academics, [and] interpersonal relationships"; and (3) the presence of a low IQ before the age of 18. According to Dr. Gardner's report, respondent's IQ is 62, which is in the "Very Low range" and "places her below 99% of same aged peers."

¶ 17    Dr. Gardner admitted that she did not perform a "parenting capacity assessment" of respondent, so she could not "make specific comments about [respondent's] parenting, other than to say that someone with an intellectual disability would have difficulties in many spheres that could impact parenting, judgment, insight, ability to accomplish tasks, interpersonal relationships and making good decisions." Dr. Gardner agreed that all those things "are required to be able to effectively parent."

¶ 18    Dr. Gardner determined that respondent "meets the DSM-5 diagnostic criteria for an intellectual impairment, mild." Dr. Gardner assessed respondent's adaptive functioning using the Adaptive Behavior Assessment System and found "significant impairment in all areas of life skills, such as communication, ability to socialize in an appropriate way, to take care of the home, to engage in functional academics, can you make change for a dollar bill if you go buy things, can you make reasonable assessments and judgments."

Respondent has suffered from her intellectual disability since at least the age of

five, and her condition will not improve. In Dr. Gardner's opinion, respondent "has deficits in adaptive functioning that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility." Dr. Gardner believed respondent demonstrated "poor judgment" because she planned to move to Chicago and "expected the agency to drive the child up once a week for her visits, which would be over a two-hour drive one way for a little child in a car on a weekly basis." Dr. Gardner testified that an intellectual disability like respondent's "does not change" but "remains steadfast throughout the life span." Dr. Gardner opined that no services or treatment would help respondent overcome her disability.

¶ 19    On cross-examination, Dr. Gardner conceded that there is no minimum IQ that makes one unable to parent. However, she explained that any person with an IQ of 69 or below "would receive a diagnosis of intellectual impairment." In discussing respondent's ability to parent, Dr. Gardner stated: "In my estimation, her decision to move to Chicago from Bloomington would significantly impact her ability to form a bond with her youngest child." Dr. Gardner agreed that respondent's intellectual disability "requires support" and makes "independent parenting unlikely."

¶ 20                              2. *Jonna Tyler*

¶ 21    Jonna Tyler, a licensed clinical professional counselor, testified next. The State moved to admit Tyler's CV, which the trial court admitted without objection. Thereafter, the court accepted Tyler "to be an expert in the field of counseling without objection." Tyler testified that the purpose of a parenting capacity assessment is to determine "a parent's ability to provide adequate care for a particular child." Her assessments require her to (1) review records, (2) interview the caseworker, (3) meet with the parent individually to conduct a caregiver interview, and (4) meet with the parent and child together.

¶ 22　　　　Tyler authored a parenting capacity assessment report for respondent in January 2025. That report was admitted into evidence without objection. Tyler's conclusion in that report was that respondent "is not capable of adequately parenting her child, as her ability to meet her child's needs is limited due to her intellectual disability."

¶ 23　　　　Tyler had previously conducted a parenting capacity assessment for respondent with respect to her three other biological children in 2021 or 2022. Respondent receives Social Security Income for an "intellectual disability." Respondent had health issues, including diabetes and a hernia. Respondent needed surgery for her hernia, but her surgeon indicated that "her diabetes needed to be better managed before she could have the surgery." Tyler discussed with respondent K.D.'s medical conditions. Respondent did not believe K.D. had a blood disorder and insisted that she was "just a carrier of the disorder," which is not correct. K.D. was also under the care of a cardiologist because of a heart condition. K.D. also had "delays identified" in some areas, such as fine motor skills, but respondent "was not aware or in agreement." Tyler believed that respondent did not understand K.D.'s medical needs "due to her intellectual limitations."

¶ 24　　　　Tyler concluded that respondent "was not able to safely parent this child and meet her needs because of [*sic*] her deficits would interfere with her ability to meet the child's medical needs and caregiving needs overall." Tyler opined that respondent's "intellectual disability does interfere with her ability to safely and effectively parent." Tyler personally observed respondent's inability to meet K.D.'s needs when K.D. had "a very dirty diaper that [became] obvious because of the smell, but [respondent] didn't seem to notice." Tyler let it go on for a while to see if respondent would notice, but she never did. Tyler opined that respondent did not have "the ability to independently and safely discharge parental responsibilities as to [K.D.]" because "[h]er intellectual disability would impair her ability to meet the child's basic caregiving needs." Tyler

said her "observations supported those opinions." Tyler did not believe that respondent had a responsible secondary caregiver or "support system" that could assist her because her mother had been involved with DCFS "several" times and had "people coming and going within [her] residence that were in question."

¶ 25    After concluding her assessment, Tyler opined that respondent would not be able to independently and safely discharge her parental responsibilities to K.D. "in the future." Tyler opined that respondent's inability "will extend beyond a reasonable time and in the foreseeable future." Tyler determined that no treatment or services could help respondent.

¶ 26                                3. *Natahsa Bever*

¶ 27    Natasha Bever, K.D.'s former caseworker and current foster care supervisor, testified that she began as K.D.'s caseworker shortly after her birth in April 2023. Since December 2023, K.D. has been with the same foster family. Bever reported that K.D. was diagnosed with "hemophilia type A mild that was diagnosed by a hematologist at the Bleeding and Clotting Disorder Institute" in November 2024. Because of her condition, she was not allowed to participate in contact sports because even a minor injury could cause her to bleed profusely. According to Bever, respondent had never understood and accepted that K.D. had a blood disorder. K.D. "participate[d] in early intervention services," was receiving speech therapy, and was being "followed and monitored by physical therapy, occupational therapy and developmental therapy." K.D. needed a "specialized level of care based upon her medical diagnosis and needs."

¶ 28    Bever reported that respondent has diabetes, as well as a hernia and adhesions that require surgery. Respondent had been unable to have surgery because she had not reduced her A1C to the level her surgeon required. According to Bever, respondent's inability to improve her A1C levels was causing her "severe neuropathy" and putting her "at risk for losing her sight and

amputation and kidney disease." Because respondent had been unable to reduce her A1C in the past two and a half years, Bever believed that respondent's diabetes would "continue to affect her negatively." Respondent's inability to handle her own medical conditions made Bever question if respondent would be able to "manage the medical [conditions] of [K.D.] as well." Respondent never had unsupervised visits with K.D. "[d]ue to concerns with her ability to take care of [K.D.]" Respondent missed some visits and ended some early "due to her own medical conditions."

¶ 29    Bever was concerned about respondent's support system, which consisted primarily of her mother. Respondent's mother had "a history of DCFS investigations," which prevented any of respondent's children from being placed with her. Additionally, Bever testified that "[t]hroughout the life of this case, there's been concern about who resides in the home" with respondent and her mother. Bever discovered that respondent's mother lied and was not forthcoming about who lived with her.

¶ 30                                4. *Trial Court's Finding*

¶ 31    After the close of the State's evidence, the State indicated that it would only be proceeding under section (1)(D)(p) of the Adoption Act and withdrew its allegation of unfitness under section (1)(D)(m)(ii). Respondent did not present any evidence.

¶ 32    In closing, the State argued that it had proven by clear and convincing evidence all the requirements of section (1)(D)(p) of the Adoption Act based on the testimony of its witnesses. Respondent argued that "despite the conclusions of the evaluators, we don't believe the State has met its burden on the legal unfitness." The guardian *ad litem* argued that the State had proved unfitness "by clear and convincing evidence."

¶ 33    The trial court stated that it considered the testimony of the witnesses and the evidence presented at the hearing. In discussing the case, the court stated:

"[W]e're not dealing with a teenager. We're dealing with a child that was removed at birth and has been in care for a substantial period of time, for a couple of years, so from infancy into basically being a toddler. So this is a child who is dependent upon the individuals who care for her, and that's significant in this case."

The court concluded "that the State has established by clear and convincing evidence that [respondent] does suffer from a mental disability, it has an impact on her ability to discharge her parental responsibilities, and the Court believes that will extend beyond a reasonable time period." The court also found that respondent's disability existed before respondent reached the age of 18. Thus, the court found respondent unfit on the ground the State alleged. The court entered a written order stating that the State proved by clear and convincing evidence that respondent was unfit pursuant to section (1)(D)(p) of the Adoption Act (750 ILCS 50/1(D)(p) (West 2024)).

¶ 34                                  E. After the Unfitness Hearing

¶ 35        Immediately after the fitness hearing, the trial court held a best-interest hearing. Following that hearing, the court found it was in K.D.'s best interest to terminate respondent's parental rights. The court entered a written order terminating respondent's parental rights to K.D.

¶ 36        This appeal followed.

¶ 37                                  II. ANALYSIS

¶ 38        Respondent argues that the trial court's finding of unfitness was against the manifest weight of the evidence. She does not challenge the best-interest finding.

¶ 39        A finding of unfitness of a parent must be based on "clear and convincing evidence." 705 ILCS 405/2-29(4) (West 2024). We will reverse a finding of parental unfitness only if it is against the manifest weight of the evidence. *In re I.W.*, 2018 IL App (4th) 170656, ¶ 35. "A determination of unfitness is against the manifest weight of the evidence only if the

opposite conclusion is clearly evident or the determination is unreasonable, arbitrary, or not based on the evidence presented." *In re Addison R.*, 2013 IL App (2d) 121318, ¶ 22.

¶ 40 Section 1(D)(p) of the Adoption Act provides that the following is a ground of parental unfitness:

"Inability to discharge parental responsibilities supported by competent evidence from a psychiatrist, licensed clinical social worker, or clinical psychologist of mental impairment, mental illness, or an intellectual disability as defendant in Section 1-116 of the [Code], or developmental disability as defined in Section 1-106 of that Code, and there is sufficient justification to believe that the inability to discharge parental responsibilities shall extend beyond a reasonable time period." 750 ILCS 50/1(D)(p) (West 2024).

¶ 41 Section 1-116 of the Code, in turn, provides as follows:

" 'Intellectual disability' means a disorder with onset during the developmental period (before the individual reaches age 22), that includes both intellectual and adoptive deficits in conceptual, social and practical domains. The following 3 criteria must be met: (1) deficits in intellectual functions such as reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience confirmed by both clinical assessment and individualized, standardized intelligence testing (generally indicated with an IQ score of about 70 or below), (2) deficits in adaptive functioning that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility. Without ongoing support, the adaptive deficits limit functioning in one or more activities of daily life, such as communication, social participation, and

independent living, across multiple environments, such as home, school, work, and community, and (3) onset of intellectual and adaptive deficits during the developmental period." 405 ILCS 5/1-116 (West 2024).

¶ 42     Here, the evidence supported the trial court's finding of unfitness. As required by section 1(D)(p), a licensed psychologist, Dr. Gardner, testified that respondent suffers from an "intellectual disability," as defined in section 1-116 of the Code, in that she has deficits in intellectual functioning, such as reasoning, problem solving, planning, abstract thinking, judgment, and academic learning, confirmed by Dr. Gardner's clinical assessment and individualized intelligence testing, which showed respondent's IQ score of 62. Additionally, respondent has "significant impairment in all areas of life skills," including communication, socialization, taking care of her home, functional academics, and judgment. Respondent also has "deficits in adaptive functioning that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility." 405 ILCS 5/1-116 (West 2024). Further, respondent has experienced her intellectual and adaptive deficits since "at the least the age of five" and will have them forever.

¶ 43     Respondent concedes that the State established, through the testimony of Dr. Gardner, that she has a qualifying disability but contends that the State failed to prove the other elements by clear and convincing evidence. We disagree.

¶ 44     It is true that Dr. Gardner admitted that she did not perform a parenting capacity assessment for respondent and failed to identify a minimum IQ required to parent. However, respondent's IQ was 62, which is in the "Very Low range" and "places her below 99% of same aged peers." According to Dr. Gardner, that IQ would cause respondent to have difficulties in "many spheres" that are required to effectively parent, including judgment, insight, ability to

accomplish tasks, interpersonal relationships, and making good decisions. Furthermore, Gardner provided a specific example of how respondent's "poor judgment" was reflected in her parenting because respondent was choosing to move to Chicago, several hours away from T.D., even though doing so would seriously interfere with her bond with T.D.

¶ 45   Additionally, as the State pointed out, the testimony of Tyler and Bever also supported the trial court's conclusion that all elements were proven by clear and convincing evidence. Tyler provided testimony supporting respondent's "[i]nability to discharge parental responsibilities." 750 ILCS 50/1(D)(p) (West 2024). Tyler completed a parenting assessment, which required her to spend time with both respondent and K.D. As a result of her assessment, Tyler opined that respondent "is not capable of adequately parenting her child, as her ability to meet her child's needs is limited due to her intellectual disability." Tyler provided several bases for this conclusion. First, respondent failed to notice that K.D. had a "very dirty diaper." Second, respondent was not adequately addressing her own health conditions. Third, respondent refused to acknowledge the existence of K.D.'s medical conditions, including hemophilia. Fourth, respondent's support system consisted primarily of her mother, who had previous involvement with DCFS and was not forthcoming about who lived with her.

¶ 46   Tyler concluded that respondent did not have "the ability to independently and safely discharge parental responsibilities as to [K.D.]" because "[h]er intellectual disability would impair her ability to meet the child's basic caregiving needs." Tyler also concluded that respondent's inability to be a caregiver for K.D. would "extend beyond a reasonable time and in the foreseeable future." She also testified that no treatment or services could help respondent's inability to parent.

¶ 47   Finally, Bever, who had interacted with respondent for more than two years,

testified that despite respondent being told about K.D.'s medical conditions, she refused to accept that they existed. Bever also had concerns about respondent being able to take care of K.D. and her medical needs because respondent was not taking care of her own health. Bever reported that respondent had never been allowed to have unsupervised visits with K.D. because of "concerns with her ability to take care of [K.D.]" Additionally, Bever testified that respondent did not have a stable and reliable support system, as respondent's "primary support system has been her mom," who had "a history of DCFS investigations" and lied to Bever about who resides in her home.

¶ 48 The testimony of Dr. Gardner, Tyler, and Bever together was sufficient to establish that (1) respondent suffered from an intellectual disability, as demonstrated by both intellectual and adaptive deficits; (2) respondent has suffered from this disability since she was at least five years old; (3) respondent's disability makes her unable to discharge her parental responsibilities; and (4) respondent will have the intellectual disability for the rest of her life.

¶ 49 Nevertheless, respondent argues that despite her shortcomings, she was able to complete some services during the relevant period, showing that she can effectively parent K.D. However, it is not enough to for a parent to simply go "through the motions, checking off the boxes" and mechanically completing services without learning from the services and implementing what they learned. See *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 56. Here, the evidence showed that despite respondent completing some services, she did not understand and accept that K.D.'s medical conditions existed. All the services in the world could not protect K.D. if she were to experience an episode of hemophilia with respondent; respondent would be unable to assist her because she refused to acknowledge the existence of her condition and learn what to do if a medical emergency occurred. A trial court should not return a child to a parent's custody if it is unsafe to do so. *Ta. T.*, 2021 IL App (4th) 200658, ¶ 55.

¶ 50 As the trial court noted, K.D. is a very young child who requires significant care, especially in light of her medical conditions. Because of respondent's intellectual disability, she cannot understand or meet K.D.'s needs. Based on the evidence and testimony provided in this case, the court's finding that the evidence showed by clear and convincing evidence that respondent was unfit pursuant to section (1)(D)(p) of the Adoption Act (750 ILCS 50/1(D)(p) (West 2024)) was not against the manifest weight of the evidence.

¶ 51                                    III. CONCLUSION

¶ 52        For the reasons stated, we affirm the trial court's judgment.

¶ 53        Affirmed.